**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0936n.06
Filed: November 28, 2005

**No. 04-4104**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA, )
)
      Plaintiff-Appellee, )
)
      v. )
)
PIERRE NAPPIER, )
)
      Defendant-Appellant. )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

BEFORE: MOORE, GIBBONS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant-appellant Pierre Nappier appeals a judgment of conviction for felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1) following a jury trial. On appeal, Nappier argues that the district court improperly denied his motion to suppress certain incriminating evidence collected during an unlawful search by law enforcement officers of Nappier's home. The government asserts that Nappier's Fourth Amendment rights were not violated and that the district court did not clearly err in finding that he voluntarily consented to the search of his home. For the reasons set forth below, we affirm the district court's order denying defendant's motion to suppress certain evidence.

I.

On or around October 2, 2002, Steve Bartinski, Vice-President and General Manager of Hough Supply Company ("Hough Supply"), a cleaning products distributor, contacted the Cleveland Police Department to report a possible scheme to obtain cleaning supplies by using a fraudulent credit card. Specifically, Bartinski relayed that Hough Supply received a credit card phone order on September 19, 2002, for substantial cleaning supplies, which two unidentified individuals picked up thereafter. Bartinski subsequently learned the credit card was fraudulently obtained and advised the Cleveland Police that the same caller had placed a second order for more cleaning supplies. The police asked Bartinski to contact the Third District Strike Force ("Strike Force") when the caller arranged to pick up the second order.

On October 4, 2002, Bartinski called the Strike Force detectives and informed them that individuals traveling in a white van were in the parking lot of Hough Supply preparing to pick up the second order. In response, the Strike Force dispatched several undercover vehicles that drove to Hough Supply and waited for the individuals to load the white van. Once the van was loaded, Strike Force officers followed it to the residential address of 1368 East 91st Street, Cleveland, Ohio, where they observed two male occupants position the van alongside the residence, exit, and begin to unload the van. The officers converged and apprehended the two individuals, who told the detectives that they were at the residence to make a delivery to an individual named "Pierre."[1]

---

[1]Another Strike Force member testified that the van occupant "said Pierre, and then we got his last name." It is, however, unclear from the testimony when the Strike Force learned Pierre's last name.

The Strike Force members subsequently identified an individual sitting on the porch of the residence as Maurice Nappier, who informed them that he lived at the residence with his father, Pierre Nappier. He further advised the Strike Force that his father was inside the residence. Maurice then accompanied the officers to a side door, where they knocked and were met by a gentleman who answered the door and identified himself as Pierre Nappier. Members of the Strike Force arrested Nappier, placed him in handcuffs, and detained him for further questioning about the fraudulently obtained cleaning supplies. Prior to his arrest, Nappier's name had not come up during the Strike Force's investigation, and, accordingly, the lead Strike Force detective described the illegality as "[j]ust the fact that the stolen property was sitting in front of [the residence], that's it." After informing Nappier of his *Miranda* rights, a Strike Force member placed Nappier in the backseat of a detective's vehicle and spoke with Nappier for between 5-10 minutes to determine whether he would consent to a search of his property. In doing so, the Strike Force member presented a standard two-page "Consent to Search Form" to Nappier.

As Nappier reviewed the Consent to Search Form, a Strike Force member indicated that if Nappier did not sign the consent form, then the Strike Force would simply obtain a search warrant. The officer further informed Nappier of the purpose for the search and that Nappier retained the right to refuse his consent to allow the Strike Force to search his home. Nappier agreed to a search of his home so long as he could be present in the house during the search.[2] Given that a crowd was

---

[2]A member of the Strike Force made one handwritten modification to the consent form, which noted that "necessary detectives," rather than a single detective, would execute the search.

beginning to gather near the front of the residence, the officers removed Nappier's handcuffs and escorted him out of the vehicle to the back of the house where Nappier signed the consent form.[3]

The Strike Force members thereafter commenced searching Nappier's residence. In the course of the search, during which Nappier was present, they recovered a loaded Hi-Point .380 caliber pistol in the room Nappier identified as his son's. In the closet of a separate bedroom, the Strike Force also recovered two boxes of .380 caliber ammunition and one box of .12 gauge shotgun ammunition. As the Strike Force officers subsequently speculated about whether Nappier or his son owned the gun, Nappier spoke up and said, "that's my gun."

Upon completing the search, Nappier was taken to a Strike Force member's office and asked to review and sign the inventory page of the consent form. As Nappier signed the form, the Strike Force observed Nappier add the words "on duress." In response, a Strike Force member told Nappier that "[e]veryone standing here knows when you signed the original, that wasn't there. How could you write that now? That doesn't make sense." Nappier then returned the signed and annotated form to the Strike Force.

A Strike Force member then conducted an extremely brief interview with Nappier. At the outset, the officer first asked, and Nappier responded affirmatively, whether Nappier understood his constitutional rights and, if so, whether he would agree to submit to questioning. Although the

---

[3]The consent form is actually two parts. The first side details the language of consent itself, while the second side provides space for detectives to detail an inventory of items taken as a result of the search. Ordinarily, a suspect signs the consent portion *before* the search and the inventory portion *after* the search.

Strike Force member thereafter learned nothing relevant from Nappier about the credit card fraud investigation, Nappier indicated that he had purchased the gun on the street in September of 2002.

A grand jury returned a one-count indictment against Nappier on July 2, 2003, charging him with unlawfully possessing a firearm as a prior felon in violation of 18 U.S.C. § 922(g)(1). In response, Nappier filed a motion to suppress all testimonial and tangible evidence uncovered by the search, arguing that (1) the Strike Force did not have reasonable suspicion to approach him; (2) even if they did, the Strike Force did not have probable cause to arrest; and (3) he did not voluntarily consent to the search of his residence. The government opposed the motion and, following an evidentiary hearing, the district court granted Nappier's request to file supplemental materials related to his motion. The court did not rule on the motion until immediately before the commencement of Nappier's trial, when it denied Nappier's motion.

In denying Nappier's motion, the court issued a brief oral decision. Most pointedly, it emphasized that "[t]here is no question that it is in effect unrebutted that [Nappier] consented to the search and then walked around the home with the officers during the search, as well as the statements that were made." The court also noted that, given his criminal history, "Mr. Nappier certainly is well-versed with what *Miranda* rights are," and, perhaps more significantly, "he was advised by two different officers of his rights and he spoke willingly to the officers and pointed different things out [during the search]." The court, however, did not expressly address Nappier's reasonable suspicion and probable cause arguments.

At the conclusion of trial, the jury returned a verdict of guilty on the single count indictment. Nappier was then sentenced to a term of forty-one months in the custody of the Bureau of Prisons to be followed by a three-year period of supervised release. This timely appeal followed.

## II.

"In assessing a challenge to the district court's ruling on a motion to suppress, we review the district court's factual findings for clear error, and its legal conclusions de novo." *United States v. Waller*, 426 F.3d 838, 843 (6th Cir. 2005) (citing *United States v. Crozier*, 259 F.3d 503, 510 (6th Cir. 2001)). We will overturn the district court's factual findings only if we possess a "'definite and firm conviction that a mistake has been committed.'" *United States v. Worley,* 193 F.3d 380, 384 (6th Cir. 1999) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Moreover, where the district court has denied the motion to suppress, "the appellate court must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). We review de novo a court's determination of whether probable cause existed to support a warrantless arrest. *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2005).

## III.

Nappier contends that the Strike Force lacked "reasonable suspicion" to approach him at his residence. Nappier further asserts that, even if Strike Force members possessed a reasonable suspicion to approach him at his residence, they did not have probable cause to arrest him without a warrant. We disagree.

A.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. CONST. AMEND. IV. Before evaluating Nappier's first argument, we must determine, as a threshold issue, whether the actions of the Strike Force prior to Nappier's arrest constituted a "seizure" within the meaning of the Fourth Amendment. Indeed, only if Nappier was "seized" would he be vested with any right to constitutional safeguards. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) ("[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained."); *see United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir. 1983) ("[T]his Court has adopted the test utilized [in *Mendenhall*] for determining whether and when a seizure has occurred . . . ." (citations omitted)).

The Supreme Court has indicated that a "seizure" occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554; *see Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Pursuant to that standard, courts consider "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the

citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

Significantly, however, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [it be held] that a 'seizure' has occurred." *Id.* "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions," *Bostick*, 501 U.S. at 434 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)), provided they do not induce cooperation by coercive means, *see United States v. Drayton*, 536 U.S. 194, 200-01 (2002). The fact that an encounter is initiated by police officers at the individual's home does not create a "seizure" in what otherwise would be a consensual contact. *Accord United States v. Chambers*, 395 F.3d 563, 567 n.2 (6th Cir. 2005) (describing the "knock and talk" technique and noting that "[c]ourts generally have upheld this investigative procedure as a legitimate effort to obtain a suspect's consent to search").

In this case, when the officers went to the entrance of Nappier's residence, knocked on the door, waited for him to respond, and asked him to identify himself when he appeared, the officers were engaging Nappier in a consensual contact that did not implicate the Fourth Amendment. During this period of time, Nappier was free to disregard the officers' request that he come to the

door, was free to decline to answer the officers' preliminary, nonthreatening questions, and was free to otherwise terminate the encounter. Thus, because Nappier was subjected to no coercive police activity when the officers encountered him at his doorstep and asked his name, he was not "seized" for Fourth Amendment purposes.

Furthermore, even assuming arguendo that the officers' conduct in approaching Nappier at his doorstep amounted to a "seizure" and implicated the Fourth Amendment, the seizure was clearly supported by a reasonable suspicion that he had committed, was then committing, or was about to commit a crime. Even an investigatory detention rising to the level of a "seizure" may nonetheless be constitutionally permissible if "supported at least by a reasonable and articulable suspicion that the person seized [was] engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980). Courts must review the totality of the circumstances to determine which suspicions are, in fact, "reasonable and articulable." *United States v. Cortez*, 449 U.S. 411, 417 (1981). In doing so, we must ensure that law enforcement has demonstrated the existence of a "particularized and objective" basis for their suspicions. *Id.*

From an objective standpoint, the Strike Force possessed a reasonable and articulable suspicion that Nappier was engaged in criminal activity. Indeed, the Strike Force was privy to the following information: (1) unidentified individuals were unlawfully using credit card numbers to fraudulently obtain cleaning supplies; (2) the stolen merchandise was transported in a white van to the front of Nappier's residence on October 4, 2002; (3) upon arrival, two individuals exited the white van and began unloading it; (4) the driver of the van subsequently informed the Strike Force

that they were making a delivery to "Pierre;" and (5) Nappier's son, Maurice, informed the Strike Force that he lived at the 1368 East 91st Street address with his father. From this information, it was objectively reasonable for the Strike Force to knock on Nappier's door and confirm whether he, in fact, lived at the 1368 East 91st Street address. *See United States v. Anderson*, 923 F.2d 450, 455 (6th Cir. 1991) ("This court has held that reasonable suspicion can be based on a totality of circumstances no one of which standing alone would create a reasonable suspicion." (citation omitted)).

## B.

Nappier's arrest was also constitutionally permissible. At the moment of arrest, the facts and circumstances known to the Strike Force from reasonably trustworthy information "were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "[T]he existence of probable cause should be determined on the totality of the circumstances. This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (citations omitted).

The factual circumstances known to the officers as a result of their contact with Hough Supply, their surveillance of the van, and their ensuing interviews with the driver of the van and Maurice Nappier at the scene, provided the officers with reasonable grounds to believe that the occupant of 1368 East 91st Street named "Pierre" was the intended recipient of the fraudulently obtained merchandise or at least that "Pierre" was otherwise involved in the fraud. When Nappier

answered the door and identified himself as "Pierre Nappier" and confirmed that he lived there, the officers had reasonable grounds to believe that he was involved in the fraud and was in fact the "Pierre" whom the van driver had just implicated. In other words, at the point in time when Nappier identified himself at the doorstep and verified that he resided at that address, the officers possessed information which would warrant a reasonably prudent man in believing that he had committed or was in the process of committing a criminal offense. *See Beck,* 379 U.S. at 91.

Under the circumstances, the encounter with Nappier at the house was consensual and there was no illegal "seizure" in violation of the Fourth Amendment when the police approached him at his house. Even assuming arguendo that a "seizure" occurred for Fourth Amendment purposes, the Strike Force possessed a reasonable and articulable suspicion that Nappier was engaged in criminal activity so as to justify such a seizure and detention. Further, based on the totality of the circumstances at the time of Nappier's arrest, the Strike Force had probable cause to lawfully arrest Nappier.

IV.

Finally, Nappier argues that the district court's finding that his consent was voluntary and not the product of duress was clearly erroneous. Although the district court purported to consider the totality of the circumstances surrounding Nappier's consent, he contends the court "failed to consider the environment under which his consent was procured." Nappier points to the ten or more law enforcement officers on scene, the presence of a canine unit, the fact that he signed the consent form after a discussion with the officers for 5-10 minutes while handcuffed in the back of a police

cruiser, the fact that he told officers that he did not wish to speak to them without a lawyer, and that he wrote "duress" next to his signature on the consent form.[4] Surely, concludes Nappier, the totality of those circumstances, which the district court did not consider, reveals a clearly erroneous finding of consent. We disagree.

The Supreme Court has long recognized that "a man's home is his castle" and, specifically, that such a right to be secure from intrusion is embodied by the Fourth Amendment. *Minnesota v. Carter*, 525 U.S. 83, 94 (1998) (Scalia, J., concurring) (emphasis omitted); *see United States v. Nelson*, 459 F.2d 884, 885 (6th Cir. 1972) (noting that the Fourth Amendment exists to ensure the inviolability of an individual's home). The Fourth Amendment therefore prohibits searches without a warrant except in limited circumstances, such as when the search is conducted with consent. *See Florida v. Royer*, 460 U.S. 491, 497 (1983); *see also United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) ("A search may be conducted without a warrant if a person with a privacy interest in the item to be searched gives free and voluntary consent" (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Where, as here, the legality of a search turns on the validity of a suspect's consent, we have summarized the appropriate analysis for determining the validity of a consent to search as follows:

> A court will determine whether consent is free and voluntary by examining the totality of the circumstances. It is the Government's burden, by a preponderance of the evidence, to show through "clear and positive testimony" that valid consent was obtained. Several factors should be examined to determine whether consent is valid,

---

[4]The district court made no factual finding related to Nappier's alleged "duress" notation on the consent form, and the parties disagree as to when Nappier made the notation and what significance, if any, that notation possesses.

> including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.

*Riascos-Suarez*, 73 F.3d at 625 (quoting *United States v. Scott*, 578 F.2d 1186, 1188 (6th Cir. 1978)). Consent can be obviated by duress, coercion, or trickery. *See United States v. Buchanan*, 904 F.2d 349, 355 (6th Cir. 1990).

Viewing the totality of the circumstances in this case, we hold that the district court's finding that Nappier's consent was voluntary was not clearly erroneous. Although defendant complains that he was in custody at the time he signed the consent form, "the fact of custody alone is not enough to demonstrate that the consent was coerced." *United States v. Blakeney*, 942 F.2d 1001, 1016 (6th Cir. 1991) (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)). And, although the Strike Force stated an intent to obtain a search warrant if Nappier declined to provide his consent, this Court has previously indicated that such statements do not vitiate consent. *United States v. Blanco*, 844 F.2d 344, 351 (6th Cir. 1988) (upholding finding of voluntariness even though the investigating agent informed the suspect that if he refused to sign a consent to search form, the agent would attempt to secure a search warrant). Moreover, as the government and district court note, Nappier is familiar with the criminal justice system, *cf. Watson*, 423 U.S. at 424-25, and the Strike Force administered *Miranda* warnings to Nappier and advised him of his constitutional right to refuse consent, *see Blakeney*, 942 F.2d at 1016 (noting suspect was read his *Miranda* rights). Considering the foregoing, Nappier's consent was voluntary and freely given. *Cf. Watson*, 423 U.S. at 424-25 (finding defendant voluntarily consented to search after considering the following factors: (1) no

threat of force against defendant, (2) law enforcement made no promises, (3) consent given in

public, (4) defendant was not a "newcomer to the law," (5) defendant was not mentally deficient,

and (6) arresting officers administered *Miranda* warnings).

     Affirmed.