*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0191p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 06-3321

STEVEN G. CAMPBELL,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 05-00468—James Gwin, District Judge.

Argued: March 16, 2007

Decided and Filed: May 24, 2007

Before: COLE, CLAY, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Duane J. Deskins, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. Charles E. Fleming, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Duane J. Deskins, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellant. Charles E. Fleming, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellee.

GILMAN, J., delivered the opinion of the court, in which CLAY, J., joined. COLE, J. (pp. 9-12), delivered a separate dissenting opinion.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Steven G. Campbell was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was found in possession of both a handgun and quarter-ounce-size bags of marijuana after a police officer arrested him and searched his car incident to the arrest. The key issues on appeal are (1) whether the initial interaction between the police officer and Campbell was a consensual encounter or an involuntary detention, and (2) did the officer have probable cause to arrest Campbell at the point that Campbell was "seized" for Fourth Amendment purposes.

Campbell moved to suppress the evidence obtained during his arrest, contending that the evidence was inadmissible because it resulted from an unreasonable seizure. The district court

1

granted the motion, which prompted the government to file this interlocutory appeal. For the reasons set forth below, we **REVERSE** the district court's grant of Campbell's motion to suppress and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

At approximately 10:30 p.m. on the evening of July 22, 2005, police officer Michael Salser was on routine patrol in a marked police car in the vicinity of McClurg Road in Boardman Township, Ohio. The area had recently experienced a rash of break-ins and car thefts. Officer Salser stopped at the intersection of McClurg Road and Southern Boulevard behind a black Chevrolet Cavalier driven by Campbell. As the Cavalier turned east on McClurg Road, Officer Salser followed it. Campbell soon turned into the parking lot of Modern Building Supply, a home-building supply store that was closed at the time. Officer Salser observed Campbell exit the car and talk on his cell phone as he proceeded on foot toward McClurg Road. As Officer Salser drove past the Modern Building Supply lot, he watched Campbell cross McClurg Road on foot and enter the parking lot of American Church, Inc., a manufacturer of church stationery. American Church was also closed at the time.

Campbell stood near the street in the American Church parking lot and continued to talk on his cell phone. Officer Salser turned his patrol car around and parked in the American Church parking lot. He did not activate his emergency lights or siren. Although he informed a police dispatcher that he was in the parking lot with a black male, he did not run the Cavalier's license plates through dispatch as a means of identifying the driver.

While Campbell continued speaking on his cell phone, Officer Salser exited the patrol car, approached Campbell, and asked him if everything was okay. Campbell replied that he had gotten lost trying to pick up his girlfriend from work and was on the phone with her to get directions. He handed the phone to Officer Salser, who spoke with a woman who identified herself as Campbell's girlfriend and explained that she worked at Treeman Industries. After contacting the dispatcher to get the address of Treeman Industries, Officer Salser testified that he gave Campbell that address and returned the cell phone to Campbell.

Officer Salser told Campbell about the recent burglaries committed in the area and then said that he "would like to see [Campbell's] ID, just to log that I talked to him." According to Officer Salser, logging meetings with civilians is something he routinely does in his investigative work. Campbell, according to Officer Salser's testimony at the suppression hearing, responded that he did not have any identification. At the same hearing, Campbell said that he recalled telling Officer Salser that he "didn't have anything on me." Officer Salser then asked Campbell for his name, date of birth, and social security number. In response, Officer Salser testified that Campbell became "very nervous," that "[h]is hands went up," and that he said "officer, I don't want any trouble, please." At that point Officer Salser repeated his request to see some identification: "I asked him if he had a state ID, or his name and date of birth. And he could be on his way just as soon as [I] ID'd him."

Campbell then told the officer that his name was Steven Morris, that his birth date was May 17, 1981, and that he did not know his social security number. Officer Salser relayed the information to his dispatcher, who responded that she was unable to verify the name or date of birth. The dispatcher's inability to find any information with the name or date of birth provided by Campbell led Officer Salser to believe that Campbell "did not have an Ohio driver's license, or an Ohio ID, or he wasn't telling me the truth." As it turns out, Campbell's actual birth date is May 17, 1982. And although Campbell is his legal name, he testified that he sometimes goes by the name of Steven Morris because Morris is his father's last name, whereas Campbell is his mother's maiden name.

Officer Salser testified that he continued to ask Campbell for his proper name and date of birth, at which time Campbell's demeanor changed. Campbell, according to Officer Salser, had become "[e]xtremely nervous. At one point I felt that he was going to run from me. He was walking in circles. Very, very nervous." Officer Salser said, however, that he would not have restrained Campbell if the latter had sought to leave at that time.

After another officer arrived for backup, Officer Salser asked Campbell if he could pat him down for weapons. Campbell did not object and proceeded to put his hands behind his back. Officer Salser felt a bulge in Campbell's left front pocket. When asked about the bulge, Campbell responded that it was money. Officer Salser did not remove the contents from Campbell's pocket. When Officer Salser then asked about a bulge in Campbell's other front pocket, Campbell said that he did not know what was in there. According to Officer Salser, he asked Campbell if he could take out what was in Campbell's right front pocket and Campbell said yes. Officer Salser testified that he found several bags of marijuana in the pocket. At this point Officer Salser arrested Campbell and placed the bags of marijuana on the trunk of his patrol car.

After placing Campbell under arrest, Officer Salser searched Campbell's person and found $862 in his left front pants pocket. He then searched Campbell's vehicle and found a loaded handgun underneath the driver's seat. Campbell was taken to police headquarters for booking, where police officers discovered that Steven Morris was one of Campbell's aliases and that Campbell had an outstanding warrant for a parole violation in New York City.

In September of 2005, Campbell was charged in a one-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Campbell filed a motion to suppress all evidence obtained as a result of Officer Salser's stop and arrest. He argued that Officer Salser did not have a reasonable suspicion of criminal activity to justify an investigative stop or probable cause to arrest Campbell. Following an evidentiary hearing held in February of 2006, the district court granted Campbell's motion. The government timely filed this interlocutory appeal.

## II. ANALYSIS

### A. Standard of review

In reviewing a motion to suppress, we review the district court's legal determinations de novo, but will set aside its factual findings only if they are clearly erroneous. *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (quotation marks omitted). The district court's conclusion cannot be clearly erroneous where there are two permissible views of the evidence. *Id.* Furthermore, we "must review the evidence in the light most likely to support the district court's decision." *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996) (quotation marks omitted).

### B. Seizure of Campbell

"[T]he Constitution forbids . . . not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9 (1968). Encounters between police officers and citizens can be grouped into three categories: "consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause." *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994) (quotation marks omitted).

In *Florida v. Royer*, 460 U.S. 491, 497 (1983), the Supreme Court elaborated on what constitutes a consensual encounter:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

*Id.* (citations omitted). In short, because a consensual encounter does not amount to a seizure, a police officer does not need reasonable suspicion or probable cause before approaching an individual to make an inquiry. *See United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (holding that the defendant's encounter with police officers, who approached her in an airport because they suspected her of drug trafficking, did not constitute a seizure under the Fourth Amendment because a reasonable person under those circumstances would have felt free to leave).

A seizure of an individual, on the other hand, occurs when "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *Id.* at 411. The police officer's subjective intent in detaining an individual is irrelevant so long as that intent is not conveyed to the individual in a way that results in the individual believing that he or she is not free to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554 n.6 (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. Once a consensual encounter escalates to the point where the individual is "seized," the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment. *See, e.g., Reid v. Georgia*, 448 U.S. 438, 440 (1980) (noting that "any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity").

The Supreme Court has explained that, during a *Terry* stop, "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime," is permissible. 392 U.S. at 27. *Terry* does not require the officer to "be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Because the search is for the limited purpose of ensuring the safety of the officer and others around him, the search must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29.

The final category of a permissible encounter between a police officer and an individual is an arrest based on probable cause. A warrantless arrest is constitutionally valid if, "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information

were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) ("Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime."). "Probable cause is a standard more stringent than reasonable suspicion, but does not require any showing that the officer's suspicions prove to be correct or that they are more likely true than false." *Id.* (citations omitted).

Once a lawful arrest has been made, the police officer is permitted to search the individual. *United States v. Robinson*, 414 U.S. 218, 235 (1973) (holding that following "a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment"). This includes a search of the individual's vehicle. *United States v. Robinson*, 390 F.3d 853, 871 (6th Cir. 2004) (explaining that this court has allowed searches of automobiles incident to an arrest even if the "arrestee was out of the car, handcuffed, and placed in the back seat of a police cruiser"). With this conceptual framework in mind, we now turn to the issue of whether Campbell was lawfully seized by Officer Salser.

The government argues that Officer Salser had "reasonable suspicion" to stop Campbell on the parking lot and conduct a pat down for weapons when the officer first approached him. Alternatively, it contends that Officer Salser had probable cause to arrest Campbell after Campbell's response to the officer's first question, based on Campbell's statement that he did not have any identification with him. This statement, according to the government, took place before Officer Salser seized Campbell and provided probable cause because driving without a license is a violation of Ohio law. Campbell, on the other hand, argues that Officer Salser seized him without probable cause or reasonable suspicion when Officer Salser first asked him to show identification.

The district court granted Campbell's motion to suppress after concluding that Campbell was seized by Officer Salser without reasonable suspicion or probable cause. It determined that Campbell reasonably believed that he was not free to leave when Officer Salser asked Campbell to show some identification. Although the court noted that Officer Salser may have eventually developed a reasonable suspicion to support a *Terry* stop, the facts supporting that reasonable suspicion arose only after Campbell was seized:

> After Campbell failed to provide his social security number to Salser, Salser did not believe Campbell's statements regarding his name and date of birth. In the ensuing exchange with Campbell, Salser may have developed a reasonable suspicion that Campbell had made a false description of his name or birth date. . . . Campbell's pacing and agitation also made Salser fearful that Campbell might fight him. However, Salser came to this suspicion only after rejecting Campbell's request to leave the encounter to pick up his girlfriend. The grounds to believe Campbell was potentially involved in some activity only developed after the unreasonable detention.

We respectfully disagree. A person is seized when "a reasonable person would not feel free to leave an encounter with police." *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005). In *Florida v. Bostick*, 501 U.S. 429, 439 (1991), the Supreme Court stated that "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." The Court elaborated that "no seizure occurs when police ask questions of an individual, [and] ask to examine the individual's identification, . . . so long as the officers do not convey a message that compliance with their requests is required." *Id.* at 437. In our view, the interaction between Officer Salser and Campbell

did not escalate beyond a consensual encounter until after Officer Salser told Campbell that he "could be on his way just as soon as [I] ID'd him."

Officer Salser's first statement was that he would *like* to see Campbell's ID. The use of the word "like," as opposed to "need" or "want," suggests that a reasonable person would feel free to decline this request and leave the scene. Moreover, Salser had not yet called for backup. He was alone with Campbell at this point in the encounter and had neither drawn his weapon nor activated his emergency lights or siren.

Nothing about Officer Salser's first request for identification suggests that Campbell's freedom to leave the encounter was conditioned on complying with the request. Nor did Officer Salser ask Campbell to accompany him anywhere for further questioning. *See United States v. Garcia*, 866 F.2d 147, 151 (6th Cir. 1989) ("[T]he one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place to which the defendant had not planned to go.").

In *INS v. Delgado*, 466 U.S. 210, 216 (1984), the Supreme Court noted that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." Moreover, this court has previously held that the use of less permissive language by police officers than the phrase "I'd like to see some ID" did not constitute a seizure. *See United States v. Matthews*, 278 F.3d 560, 562 (6th Cir. 2002) (holding that a person walking down the street was not detained when an officer driving in a marked police car yelled "Hey, buddy, come here," with the court characterizing the statement as a request rather than an order).

We respectfully disagree with the dissent's characterization of Officer Salser's first request for identification as a seizure. The key inquiry of Campbell, according to Officer Salser, was that "before he [Campbell] left I would like to see his ID, just to log that I talked to him." In the dissent's view, this language morphs into "that he could not leave until he presented his identification" and that a reasonable person would not feel free to leave "until the Officer fulfilled his duty of logging the encounter." Dissenting Op. 10-11.

The record does not support this characterization. Officer Salser was simply giving Campbell the reason why Salser would *like* to see Campbell's ID; he was not at that point conditioning Campbell's departure on such production. Only later in their exchange—after Campbell said that he had no ID—did Officer Salser "seize" Campbell by creating the condition that "he could be on his way just as soon as [I] ID'd him."

In short, Campbell could have declined Officer Salser's initial request and left the scene of the encounter. The fact that he chose not to do so did not convert that request into a seizure within the meaning of the Fourth Amendment. *See Mendenhall,* 446 U.S. at 553 (holding that a "person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained"); *United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999) ("Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the [government] agent's request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment."); *United States v. Nappier*, 155 F. App'x 859, 864 (6th Cir. 2005) (holding that the defendant was not seized when "officers went to the entrance of Nappier's residence, knocked on the door, waited for him to respond, and asked him to identify himself when he appeared," because during that period of time "Nappier was free to disregard the officers' request that he come to the door, was free to decline to answer the officers' preliminary, nonthreatening questions, and was free to otherwise terminate the encounter"). The district court clearly erred in finding to the contrary.

## C.     Probable cause

Having determined that Campbell was not seized by Officer Salser when the officer initially asked Campbell for identification, we now turn to the question of whether Campbell's response gave Officer Salser probable cause to make the ensuing warrantless arrest. "Probable cause exists where the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1508 (6th Cir. 1988) (quotation marks omitted).

In the present case, Officer Salser observed Campbell driving a car and shortly thereafter asked to see his identification. Campbell responded that he did not have any identification with him. Under Ohio law, driving without proof of a license is a misdemeanor offense, and not having documentation on or about the driver is prima facie evidence of not having a license:

> (A)  The operator of a motor vehicle shall display the operator's driver's license, or furnish satisfactory proof that the operator has a driver's license, *upon demand of any peace officer* or of any person damaged or injured in any collision in which the licensee may be involved. *When a demand is properly made* and the operator has the operator's driver's license on or about the operator's person, *the operator shall not refuse to display the license.* A person's failure to furnish satisfactory evidence that the person is licensed under this chapter when the person does not have the person's license on or about the person's person *shall be prima-facie evidence of the person's not having obtained a driver's license.*
>
> (B)  Whoever violates this section is guilty of a misdemeanor of the first degree.

Ohio Rev. Code § 4507.35 (emphasis added).

In *United States v. Chapel*, No. 96-1176, 1997 WL 178878, at *4 (6th Cir. Apr. 11, 1997) (per curiam), this court held that an officer had probable cause to arrest the defendant because at the time of the arrest, the officer knew that the defendant was driving without a valid license due to a previous encounter with that defendant. The officer therefore "had reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [defendant] *had committed* or was committing an offense, namely, driving without a license." *Id.* (citation and quotation marks omitted) (emphasis in original). And under federal law, a police officer can arrest an individual so long as the officer has "probable cause to believe that a misdemeanor offense has been committed in his presence." *United States v. Williams*, 170 F. App'x 399, 402 n.3 (6th Cir. 2006) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)).

Because Officer Salser had probable cause to believe that Campbell had committed the misdemeanor offense of driving without proof of a license, the ensuing warrantless arrest did not violate Campbell's constitutional rights. *See Atwater*, 532 U.S. at 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). We therefore conclude that the district court erred in granting Campbell's motion to suppress.

Finally, police officers are permitted to search the vehicle associated with a defendant's lawful arrest for the purpose of taking an inventory of its contents prior to impoundment, even if the police have no probable cause to otherwise search the vehicle. *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976) (holding that an inventory search of an automobile prior to its impoundment, pursuant to standard police procedures, is reasonable under the Fourth Amendment); *see also Robinson*, 390 F.3d at 871. Accordingly, the gun retrieved from Campbell's vehicle, as well as the other evidence obtained during the inventory search, should not have been suppressed.

### III.  CONCLUSION

For all of the reasons set for above, we **REVERSE** the district court's grant of Campbell's motion to suppress and **REMAND** the case for further proceedings consistent with this opinion.

———————

**DISSENT**

———————

R. GUY COLE, JR., Circuit Judge, dissenting.  I agree with the majority's conclusion that a mere request for identification is not a seizure.  Majority Op. at 6.  If the majority were correct that Officer Salser only told Campbell that he would *like* to see his identification, then I might also agree with the majority that such a request is not a seizure.  I part ways with the majority because the facts adduced at the suppression hearing reveal that Officer Salser did not simply ask Campbell for identification by stating, as the majority claims, that "he 'would like to see [Campbell's] ID.'"  Majority Op. at 2 (quoting Joint Appendix ("JA") 74).  Rather, the facts indicate that Officer Salser instructed Campbell that "*before [Campbell] left* [he] would like to see his ID."  (JA 74 (emphasis added).)  By conditioning Campbell's ability to leave on his first producing valid identification, Officer Salser transformed what could otherwise have been a simple request for identification into a command that Campbell would not have reasonably felt free to refuse.  Such a command constituted a seizure of Campbell.  Because Officer Salser did not have reasonable suspicion to seize Campbell at that time, I respectfully dissent.  Accordingly, I would **AFFIRM** the district court's grant of Campbell's motion to suppress the evidence obtained during his arrest and subsequent search of his car.

**I.**

The majority states that "Officer Salser told Campbell about the recent burglaries committed in the area and then said that he 'would like to see [Campbell's] ID, just to log that I talked to him.'"  Majority Op. at 2 (quoting JA 74).  Officer Salser's own testimony, however, does not support this characterization of the facts.  Rather, as indicated by Officer Salser at Campbell's suppression hearing, Officer Salser's initial inquiry into Campbell's identification went beyond a simple request:

Q:      And after they gave you the information, you told Mr. Campbell where the business was, what happened next?[1]

A:      *I told him that we had some burglaries in the area, and before he left I would like to see his ID, just to log that I talked to him.*

Q:      When you said that, is that – let me just go back by saying, is that something you do routinely in your investigative work?

A:      Yes.

Q:      What happened when you said that?  What did the defendant do?

A:      He stated that he didn't have an ID.

Q:      And I take it that under Ohio law one is required to have a driver's license?

A:      Correct.

Q:      And were you able to see his demeanor?

A:      Once I inquired about an ID and he said he didn't have one, I asked him for his name and date of birth.  And he began, became very nervous.  His hands went up.  He said, officer, I don't want any trouble, please.  Several times he stated that to me.

Q:      When you say also, in terms of nervousness, can you describe for the court what you observed that led you to that understanding, about nervousness?

———————

[1]This question relates to Officer Salser's testimony that he had asked his dispatcher for the location of Treeman Industries—Campbell's girlfriend's place of employment.  Officer Salser testified that Campbell had told him he was on his way to pick up his girlfriend at her work but was lost.  (JA 73-74.)

A:    He was walking around, not – he was just very nervous.  His hands were moving.  He kept saying, please, I don't want any trouble.  I just want to pick up my girlfriend.  Just to that effect.

Q:    Now, what did you say to him in response?

A:    *I said, I asked him for – I asked him if he had a state ID, or his name and date of birth, And he could be on his way just as soon as [I] ID'd him.*

(JA 74-75 (emphasis added).)  As the transcript of the suppression hearing shows, the majority incorrectly states that Officer Salser's initial request for identification did not condition Campbell's ability to leave on him first providing the Officer with identification.  Rather, the Officer's own testimony illustrates that he asked Campbell for identification twice, and each time he clearly conditioned Campbell's ability to leave on Campbell first producing valid identification.

The majority argues that "Officer Salser's first statement was that he would *like* to see Campbell's ID.  The use of the word 'like,' as opposed to 'need' or 'want,' suggests that a reasonable person would feel free to decline this request and leave the scene."  Majority Op. at 6.  I do not disagree with the majority that if Officer Salser had simply stated, "I would like to see your ID," that no seizure would have occurred because, as the majority concludes, the word "like" is permissive and implies that a reasonable person would feel free to decline the Officer's request.[2]  *See INS v. Delgado*, 466 U.S. 210, 216 (1984) (explaining that a request for identification by itself does not constitute a seizure under the Fourth Amendment).  However, Officer Salser's own testimony indicates that he went beyond simply stating, "I would like to see your ID."  By instructing Campbell that he could not leave until he presented his identification, Officer Salser created a condition, i.e., the presentation of a valid form of identification, that Campbell had to satisfy before he could leave the scene.  In *Mendenhall*, the Supreme Court explained that

> a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.  Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or *the use of language* or tone of voice indicating that compliance with the officer's request might be compelled.

446 U.S. at 554 (emphasis added).  Because "use of language" can indicate to a reasonable person that an "officer's request might be compelled," Officer Salser's condition would have conveyed to a reasonable person that compliance with his request to produce identification was required before being free to terminate the encounter.  *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("No seizure occurs when police ask questions of an individual, [and] ask to examine the individual's identification, . . . *so long as the officers do not convey a message that compliance with their requests is required*.") (emphasis added).

Further supporting a conclusion that a reasonable person would not have felt free to leave is Officer Salser's statement to Campbell that he wished to "log" their conversation.  (JA 74-75.)  The majority explains that "Officer Salser was simply giving Campbell the reason why Salser would like to see Campbell's ID; he was not at that point conditioning Campbell's departure on such production."  Majority Op. at 6.  The majority mischaracterizes Officer Salser's testimony.  As described above, the Officer's testimony clearly shows that Campbell was not free to leave until he produced his identification.  (JA 74.)  Thus, the problem arises not from Officer Salser's explanation

---

[2] I do not mean to suggest that every time the word "like" is used, an encounter becomes consensual.  Rather, the entire context of the encounter must be analyzed to determine whether a seizure has occurred.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

of why he wanted to see Campbell's identification, i.e., to log their conversation, but rather from Officer Salser's statement that Campbell could not leave before producing identification. Additionally, when Officer Salser's statement that Campbell could leave only after producing identification is coupled with his statement that he wanted to log their meeting, a reasonable person would have believed that he or she was not free to leave until the Officer fulfilled his duty of logging the encounter. Although Officer Salser might have intended such a statement to be explanatory, his subjective intent is irrelevant; rather, we look only to what a reasonable person would have understood the Officer's statement to mean. *See, e.g.*, *United States v. Taylor*, 956 F.2d 572, 576 n.2 (6th Cir. 1992) ("The subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted.") (quoting *United States v. Rose*, 889 F.2d 1490, 1493 (6th Cir. 1989)).

Even more telling is the majority's own statement that "the interaction between Officer Salser and Campbell did not escalate beyond a consensual encounter *until after Officer Salser told Campbell that he 'could be on his way just as soon as [I] ID'd him.'*" Majority Op. at 6 (quoting JA 75) (emphasis added). By its own admission, therefore, the majority believes that Campbell would have been seized had Officer Salser conditioned his ability to leave on Campbell first producing identification. The majority, however, mistakenly states that "[n]othing about Officer salser's first request for identification suggests that Campbell's freedom to leave the encounter was conditioned on complying with the request," but as the transcript of Officer Salser's testimony indicates, Officer Salser at all times conditioned Campbell's ability to leave on him first producing valid identification. *Compare* Majority Op. at 6 *with* JA 74-75.

Most importantly, the standard of review requires us to look at the evidence in the light most likely to support the district court's decision. *See United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996) (quotation marks omitted). Here, the district court concluded that Officer Salser seized Campbell without reasonable suspicion and therefore granted Campbell's motion to suppress. Because I agree with the district court's conclusion that a reasonable person would not have felt free to leave without first complying with the Officer's condition of presenting identification, I conclude that Officer Salser's statement amounted to a seizure of Campbell and accordingly would affirm the district court's grant of Campbell's motion to suppress.

## II.

Because Officer Salser lacked reasonable suspicion to seize Campbell, the seizure was unreasonable and violated Campbell's Fourth Amendment rights. In *United States v. Cortez*, 449 U.S. 411, 417 (1981), the Supreme Court explained that "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." Although an officer can engage in a *Terry* stop for purposes of obtaining a suspect's identity, "[t]he officer's action must be justified at its *inception*, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 185 (2004) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985) and *Terry v. Ohio*, 392 U.S. 1, 20 (1968) (quotation marks omitted)) (emphasis added); *see also Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him while attempting to obtain additional information."). In *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006), we explained that to justify a *Terry* stop a police officer must have a reasonable suspicion that the individual is engaged in criminal activity, namely, "a particularized and objective basis for suspecting the particular person . . . of criminal activity based on specific and articulable facts." *Id.* (quoting *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813-14 (6th Cir. 1999) (internal quotation marks omitted)).

Here, the facts do not support a finding that Officer Salser had a reasonable suspicion that Campbell was about to engage, or had engaged, in criminal activity. Campbell was driving in an industrial, commercial neighborhood at night. By itself, such behavior does not create sufficient grounds from which to conclude that Officer Salser had a reasonable suspicion that Campbell was engaged in criminal activity. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (explaining that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"); *Bennett v. City of Eastpointe*, 410 F.3d 810, 830 (6th Cir. 2005) ("While officers can surely and appropriately take into account the fact that an area is a high crime area, that alone, does not justify effectuating a seizure."). Campbell did not violate any traffic laws or drive in a way that might arouse suspicion, and Officer Salser did not testify to the contrary. Additionally, parking in an empty parking lot, even if the business is closed, is not suspicious behavior, because one could be looking for directions, talking on the phone, or simply taking a break from driving.

Further, Campbell's actions of exiting his car, crossing the street, and talking on his cell phone while standing in a neighboring parking lot, are also not indicative of criminal behavior. The district court noted that the two nearby businesses were not attractive targets for thieves: "If Campbell intended to break into Modern Building Supply, he would face major difficulty loading much roofing product into the Chevrolet Cavalier. If Campbell intended to break into American Church, he would face major difficulty selling church envelopes." (JA 260.) Additionally, Campbell provided a plausible explanation for his actions; he was lost, had bad cell-phone reception, and was trying to get directions from his girlfriend, as confirmed by the female caller, who spoke to Officer Salser. This should have dispelled, or at least diminished, any suspicions that Officer Salser might have had.

The Government argues that "Campbell's nervous and evasive behavior, [and] Campbell's driving without a license or identification" when "coupled with his presence at a late hour in the parking lot of two closed businesses in [a] high crime area" support a finding that Officer Salser had the reasonable suspicion necessary to justify a *Terry* stop. (Appellant's Br. 26.) Reasonable suspicion, however, must arise before an individual is seized by an officer. *See, e.g.*, *Cortez*, 449 U.S. at 417. Campbell's behavior was not nervous and evasive until *after* Officer Salser seized him by demanding identification, and Officer Salser did not discover that Campbell was driving without a license until *after* Officer Salser told Campbell that he could leave only after producing identification.

The majority correctly concludes that once Campbell told Officer Salser that he had no identification with him, Officer Salser had the probable cause necessary to arrest Campbell for violating Ohio Rev. Code § 4507.35. Majority Op. at 7 ("Because Officer Salser had probable cause to believe that Campbell had committed the misdemeanor offense of driving without proof of a license, the ensuing warrantless arrest did not violate Campbell's constitutional rights."). However, Officer Salser had probable cause to arrest Campbell only after he conditioned Campbell's freedom to leave the scene on Campbell first producing identification. Because probable cause must be present before an arrest occurs, Campbell's arrest was unreasonable under the Fourth Amendment. *See, e.g.*, *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) ("Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime.").

Accordingly, because I believe the facts indicate that Officer Salser's inquiry into Campbell's identification went beyond a simple request for identification and amounted to an unlawful seizure of Campbell, I would **AFFIRM** the district court's grant of Campbell's motion to suppress the evidence seized as a result of his arrest.