**UNITED STATES of America, Plaintiff,**

v.

**James BAKER, Defendant.**

**No. 09–20068.**

United States District Court, W.D. Tennessee, Western Division.

Nov. 2, 2010.

John D. Fabian, United States Attorney's Office, Memphis, TN, for Plaintiff.

FPD, Federal Public Defender, Tyrone Jemal Paylor, Federal Public Defender's Office, Memphis, TN, for Defendant.

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AS MODIFIED

SAMUEL H. MAYS, JR., District Judge.

Before the Court is Defendant James Baker's Motion to Suppress filed November 17, 2009 (Def.'s Mot., ECF No. 35) and Baker's Objections to the Report and Recommendation of Magistrate Judge Charmiane G. Claxton (Def.'s Objections, ECF No. 79). Magistrate Judge Claxton recommended that the Court deny Baker's Motion to Suppress. (Report and Recommendation on Def.'s Mot. to Suppress, ECF No. 77.) ("Report") Baker's objections are OVERRULED, except his objection to the Magistrate Judge's finding about the location of the drugs, which is well-taken. The Report of the Magistrate Judge is modified accordingly and

ADOPTED as modified. The Motion to Suppress is DENIED.

## I. Procedural and Factual Background

On February 24, 2009, the grand jury returned an indictment charging Baker with one count of possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1); one count of possession with the intent to distribute at least five grams of a cocaine-based controlled substance, in violation of 21 U.S.C. § 841(a)(1); and one count of using and carrying a firearm while possessing with the intent to distribute at least five grams of a cocaine-based controlled substance, in violation of 18 U.S.C. § 924(c).

Baker filed a Motion to Suppress the firearm and drugs found on his person when he was arrested on June 14, 2008. (See Def.'s Mot. 1.) The United States responded on October 4, 2010. (Gov't's Resp., ECF No. 81). Baker replied on November 27, 2009. (See Def.'s Reply, ECF No. 40.)

The Motion was referred to Magistrate Judge Claxton on November 17, 2009. (See Order of Reference, ECF No. 36.) Magistrate Judge Claxton held a hearing on March 5, 2010, at which Baker and Officer Mark Reese ("Officer Reese" or "Reese") of the Memphis Police Department testified. (See Report 1, 4.) After the hearing, both parties submitted closing briefs. (See Def.'s Position on Mot. to Suppress, ECF No. 61; Government's Proposed Findings of Fact and Mem. of Law, ECF No. 62.) Magistrate Judge Claxton filed her Report on September 13, 2010, recommending that the Court deny Baker's Motion to Suppress. (See Report.) Baker timely objected to the Re-

port on September 27, 2010 (See Def.'s Objections.)

The pending charges stem from a series of events on June 14, 2008, as Officer Reese patrolled the Northside Manor Apartments ("Northside Manor").[1] (Report 1.) Although Officer Reese was not investigating anyone in particular, his lieutenant had recently informed him of complaints by Northside Manor employees, who said drug-related activity had made it like "the wild, wild west." (Id. 1–2.) Officer Reese also knew of significant gang and drug activity in the area because of his daily patrols and his having grown up nearby and attended high school with friends who lived in the area. (Id. 2.)

Dressed in plain clothes, Officer Reese and his partner were patrolling Northside Manor in an unmarked car when Reese observed Baker. (See Report 2.) As he watched from the car, Officer Reese saw Baker stand next to a vehicle, converse with others, enter and exit an apartment repeatedly, and then engage in a hand-to-hand transaction with a vehicle's occupants. (Id.) During the transaction, Officer Reese saw Baker receive money from the vehicle's occupants in exchange for a plastic bag. (Id.)

Following this transaction, Officer Reese and his partner watched as Baker walked toward an apartment while the vehicle that Baker had approached drove off. (Id.) Officer Reese alerted the marked police unit located "around the corner" to stop the exiting vehicle. (Id.) Officer Reese believed that the occupants of the vehicle had purchased drugs from Baker and that there would be drugs inside the vehicle. (Id.) Based on his experience investigating drug transactions, Officer Reese thought Baker would only have money on his per-

---

**1.** The foregoing facts come from the Magistrate Judge's Report, ECF No. 77. Except where noted, Baker has not objected to the proposed factual findings. (See Def.'s Objections 2–4.)

son, so he elected not to approach Baker when he directed the marked unit to confront the vehicle. (*Id.* 2–3.)

As he was about to leave Northside Manor, Officer Reese testified, he saw Baker approach a second vehicle. (*See id.* 3.) According to Officer Reese, he was approximately eight feet from Baker at this time, and he observed a firearm in Baker's back pocket.[2] (*Id.*) Officer Reese initially thought Baker was "pulling" the gun, but Baker removed a plastic bag of what Reese believed to be crack cocaine from Baker's back pocket.[3] (*Id.* 3.) Officer Reese identified the drugs as crack cocaine based on his familiarity with the appearance and packaging of crack cocaine from his previous arrests of suspects involved with the drug. (*Id.*) According to Officer Reese, Baker was not trying to hide the drugs and was using no security.[4] (*Id.* 3–4.)

When he realized Baker was armed, Officer Reese contacted the marked police unit that he had previously advised to detain the vehicle engaged in the earlier transaction with Baker. (*Id.* 4) Despite his suspicion that the vehicle contained evidence of a drug transaction, Officer Reese directed the unit to abandon the stop and assist him, telling the unit that Baker had a gun. (*Id.*) The marked unit let the vehicle go and did not collect any evidence. (*Id.*) Officer Reese acted be-

cause Baker's approaching the second vehicle with a gun and crack cocaine had created a "safety issue." (*Id.*)

Officer Reese then exited his vehicle and approached Baker from behind to prevent Baker from fleeing, destroying evidence, or shooting him. (*Id.* 6.) Officer Reese's partner approached the vehicle transacting with Reese and made contact with its driver. (*Id.*) As Officer Reese approached, Baker had one hand on top of the vehicle holding a bag of crack cocaine and was speaking with the vehicle's occupants. (*Id.*) Approaching him from behind, Officer Reese grabbed Baker's right hand and used his left hand to hold the gun in Baker's back pocket. (*Id.*) Baker did not resist. He simply said "police, police" and "I have a gun in my back pocket."[5] (*Id.*) Because Officer Reese had his hand on the gun, he replied "I already know." (*Id.*) Officer Reese placed Baker in handcuffs, secured the gun and drugs, and took Baker into custody. (*Id.*)

## II. Standard of Review

■ "A district judge must determine *de novo* any part of a magistrate judge's disposition that has been properly objected to." Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). After reviewing the evidence, a court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28

---

**2.** Baker also objects to the Magistrate Judge's crediting Officer Reese's testimony that, when he observed Baker with the firearm and suspected crack cocaine, Reese was about eight feet away from Baker over Baker's testimony that Reese was "at the beginning of the driveway." (*See* Def.'s Objections 4, ECF No. 79.) Baker also objects to the Magistrate Judge's finding about the lack of record support as to the length of the driveway. (*See id.* 3.)

**3.** Baker objects to the Magistrate Judge's findings that Officer Reese thought Baker was about to pull a gun and that Baker removed

the suspected drugs from his back pocket. *See infra* Section III.A.1–2.

**4.** Baker objects to the Magistrate Judge's crediting Officer Reese's testimony over Baker's testimony on disputed issues of Reese's location when he saw the firearm and suspected crack cocaine and whether Reese saw the objects before approaching Baker. (*See* Def.'s Objections 3–4.)

**5.** Baker objects to the Magistrate Judge's finding that the first thing he said when Officer Reese engaged him was "police, police." (*See* Def.'s Objections 3–4.)

U.S.C. § 636(b)(1)(C). The district court need not review—under a de novo or any other standard—those aspects of the report and recommendation to which no objection is made. *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). The district court should adopt the findings and rulings of the magistrate judge to which no specific objection is filed. *Id.* at 151, 106 S.Ct. 466.

## III. Analysis

### A. Findings of Fact

Baker objects to five findings of fact by the Magistrate Judge: (1) that Officer Reese thought Baker was "pulling" a firearm, (2) that, at the time Officer Reese thought Baker was "pulling" a firearm, Baker instead removed drugs from his back pocket, (3) that there was no testimony supporting Baker's position as to the length of the Northside Manor driveway, (4) that Baker's initial statement when Officer Reese approached him was "police, police," and (5) that Officer Reese's testimony was more credible than Baker's testimony on the issues of where Reese was when he saw the suspected firearm and crack cocaine and whether Reese saw the objects on Baker's person before approaching him. (*See* Def.'s Objections 2–4.)

### 1. "Pulling" a Firearm

Baker objects to the Magistrate Judge's finding that Officer Reese believed Baker was "pulling" a firearm. (Def.'s Objections. 2; *see* Report 3.) Baker argues that nothing in the record implies or suggests that Baker was about to pull a firearm. (*Id.*) However, Officer Reese testified as follows: "Well, when I got to the side of him, that's when I said, 'Hey, this dude's got a gun; and he's pulling.'" (Hr'g Tr. 37, Mar. 5, 2010.) This testimony supports the Magistrate Judge's finding, and the Court finds that, based on his observations, Officer Reese initially thought that Baker was "pulling" a firearm when Baker approached the second vehicle.

### 2. Location of Drugs

Baker objects to the Magistrate Judge's finding that Officer Reese saw Baker remove drugs from his back pocket. (Def.'s Objections 3; *see* Report 3.) The United States concedes that the record shows that Officer Reese actually testified that he saw Baker remove "what appeared to be crack rock from his right front pocket." (Gov't's Resp. 5; *see* Hr'g Tr. 55.) Baker's objection is well-taken, and the Court finds that Officer Reese saw Baker remove the suspected drugs from his right front pocket rather than his back pocket. The Magistrate Judge's Report and Recommendation is modified accordingly.

### 3. Length of Driveway

Baker objects to the Magistrate Judge's finding no support for Baker's assertion that the driveway into Northside Manor was over one hundred yards long. (Def.'s Objections 3.) Baker argues that, because a quarter mile is about four hundred yards, part of Officer Reese's testimony that the driveway was "really long" and "maybe a quarter mile" supports his position. (Report 4; Def.'s Objections 3.) However, Officer Reese also testified that he was "not exactly good with distances." (*See* Hr'g Tr. 19.) Like the Magistrate Judge, the Court finds the record inadequate to support finding that the driveway was over one hundred yards long. Regardless, the specific length of the driveway is inconsequential.

### 4. Baker's Initial Statement

Baker objects to the Magistrate Judge's finding that Baker's first statement when Officer Reese approached him was "police, police." (Def.'s Objections 3; *see* Report 6.) Baker argues that Officer Reese initially testified that Baker first said "police, police," but that, on cross examination,

Reese testified that Baker first said "I have a gun in my back pocket." (Def.'s Objections 3–4 (citing Hr'g Tr. 14, 45, 47).) Officer Reese's direct testimony was as follows: "He didn't resist in any way. The first thing that he said before he even— you know, first thing he said was 'police, police.' First thing out of his mouth was, 'I have a gun in my pocket.'" (*Id.* 14.) Reviewing Office Reese's statements *de novo*, the Court finds that Reese's direct testimony, taken in context, was that "I have a gun in my pocket" was Baker's first statement to Reese. The Court finds that, when Officer Reese approached Baker, Baker said "I have a gun in my pocket."

### 5. Credibility

Baker objects to the Magistrate Judge's crediting Officer Reese's testimony over Baker's testimony on disputed issues. (Def.'s Objections 4; *see* Report 7). During the suppression hearing, Baker disputed Officer Reese's testimony about where Reese was when he allegedly saw the firearm and crack cocaine and whether Reese saw the items on Baker's person before approaching him. (Report 4.) Baker argues that the Magistrate Judge failed to consider that Officer Reese drove an unmarked vehicle, Baker was walking across the parking lot when Officer Reese allegedly saw the firearm, Officer Reese never stopped his vehicle, Officer Reese and his partner were unknown to Baker before they approached him, and, on approaching him, Officer Reese did not limit his search to Baker's outer clothing. (Def.'s Objections 4.)

None of the facts that Baker draws to the Court's attention is material on the issues of Baker's or Officer Reese's credibility. Because Officer Reese's actions comport with his testimony, his testimony is more convincing. Despite Officer Reese's belief that the first vehicle contained evidence of an earlier drug transaction, Reese directed the marked police unit to abandon its stop of that vehicle and return to assist him with a "safety issue." (Hr'g Tr. 32–33.) Officer Reese's testimony that his observation of a handgun on Baker's person led to Reese's safety concern is the only explanation in the record for this otherwise unusual request. (*Id.*; *see* Report 4.) Baker has offered no alternative explanation. Considering the issue *de novo*, the Court finds that the preponderance of evidence supports crediting Officer Reese's testimony over Baker's. Therefore, the Court finds that, from a distance of approximately eight feet, Officer Reese observed Baker with suspected crack cocaine in his hand and a firearm on his person before approaching him.

### B. Conclusions of Law

Baker objects to two conclusions of law by the Magistrate Judge: (1) that Officer Reese's search of Baker was within the scope permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and (2) that Baker's statement to Officer Reese need not be suppressed as "fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### 1. Reasonable Scope

The Magistrate Judge concluded that Officer Reese had reasonable suspicion to conduct an investigatory stop based on his observation of a hand-to-hand transaction in which Baker received money, Baker's possession of a plastic bag believed to contain crack cocaine, and Baker's possession of a firearm. (Report 10.) *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Baker does not object to this conclusion. Rather, Baker contends that Officer Reese's search exceeded the scope of an investigatory stop because "*Terry* does not permit an officer to invade the privacy of the contents of the pockets of an individual." (Def.'s Objections 5.) Because Officer Reese's placing his hand on a fire-

arm in Baker's back pocket was a permissible search incident to a lawful arrest, Baker's objection is without merit.

■ The Fourth Amendment guarantees the "right of the people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures ...." U.S. Const. amend. IV. Warrantless searches and seizures are per se unreasonable unless they are covered by a specific exception. *See Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (citing *Thompson v. Louisiana,* 469 U.S. 17, 19–20, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984)). One such exception is the search-incident-to-arrest exception, which permits police to conduct a limited post-arrest search of an arrestee's person and the area within his immediate control. *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ "The Sixth Circuit, like many other circuits, has struggled to find a workable definition of the term 'arrest.'" *United States v. Williams,* 170 Fed.Appx. 399, 403 n. 4 (6th Cir.2006). Whether a suspect has been arrested is a fact-dependent inquiry based on the totality of the circumstances. *United States v. Smith,* 549 F.3d 355, 360 (6th Cir.2008). Courts consider a variety of factors, including transportation of the suspect to another location, significant restraints on the suspect's freedom of movement involving physical confinement or coercion, use of weapons or bodily force, and issuance of *Miranda* warnings. *Smith,* 549 F.3d at 360; *Williams,* 170 Fed.Appx. at 402 (citations omitted). The Sixth Circuit has also defined an arrest in terms of the traditional test for a Fourth Amendment seizure, which asks whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Williams,* 170 Fed.Appx. at 403 n. 4 (citing *United*

*States v. Saari,* 272 F.3d 804, 808 (6th Cir.2001)).

■ When he approached Baker, Officer Reese placed significant restraints on the Baker's freedom of movement by grabbing Baker's right hand and using his left hand to hold Baker's gun. *See Smith,* 549 F.3d at 360, (Report 6). Although the Magistrate Judge did not made a finding as to whether Officer Reese had his weapon drawn, Reese used bodily force by placing his hands on Baker's person. *See Williams,* 170 Fed.Appx. at 402; (Report 6). Once Officer Reese made physical contact with Baker, Baker could not reasonably have believed that he was free to leave. *See Williams,* 170 Fed.Appx. at 403 n. 4. Shortly after engaging Baker, Officer Reese placed Baker in handcuffs and removed him from the scene. *See Smith,* 549 F.3d at 360; *Williams,* 170 Fed.Appx. at 402, (Report 6). Because Officer Reese placed significant constraints on Baker's freedom of movement through the use of bodily force, based on the totality of the circumstances, Officer Reese arrested Baker when he made physical contact with Baker.

■ "A warrantless arrest is constitutionally valid if, 'at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense.'" *United States v. Campbell,* 486 F.3d 949, 955 (6th Cir.2007) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)) (internal quotation marks omitted). Probable cause "does not require any showing that the officer's suspicions prove to be correct or that they are more likely true than false." *Id.* "To determine whether an

officer had probable cause to arrest an individual," courts "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" *United States v. Romero,* 452 F.3d 610, 615 (6th Cir.2006) (quoting *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)).

■■■■ Observing an object in plain view provides probable cause to arrest the person holding that object, if the criminal nature of the object is immediately apparent. *See United States v. Turner,* No. 94–5080, 1995 WL 63156, at *2, 1995 U.S.App. LEXIS 2952, at *6 (6th Cir. Feb. 14, 1995) (citing *Texas v. Brown,* 460 U.S. 730, 742–43, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)). Where a police officer observes an individual with suspected narcotics in plain view, the officer has probable cause to arrest the individual. *See, e.g., United States v. Thomas,* 138 Fed.Appx. 759, 761–62 (6th Cir.2005) (holding that police officer had probable cause to arrest a suspect when he observed the suspect in possession of a rock-like substance that appeared to be crack cocaine); *United States v. Marxen,* 410 F.3d 326, 331 (6th Cir.2005) (holding that police officers had probable cause to arrest a suspect after observing suspected marijuana and drug paraphernalia in his vehicle during a lawful stop); *cf. Turner,* 1995 WL 63156, at *2–3, 1995 U.S.App. LEXIS 2952, at *6–7 (holding that an officer had probable cause to arrest a suspect when the officer observed the suspect stuffing suspected cocaine into his shorts). An officer may rely on his training and experience to determine whether an object in plain view is likely narcotics. *See Thomas,* 138 Fed.Appx. at 761–62 (citing *Turner,* 1995 WL 63156, at *2–3, 1995 U.S.App. LEXIS 2952, at *6–7). An officer may rely in part on knowledge of drug activity in the area to form his conclusion. *See Turner,* 1995 WL 63156, at *2–3, 1995 U.S.App. LEXIS 2952, at *6–7 (explaining that it was "more likely than not" that a substance that looked like cocaine "was an illegal substance, given the fact that this activity occurred in an area known for drug trafficking").

■■■■ While lawfully present in the public driveway of Northside Manor, Officer Reese observed Baker with a plastic bag containing an unknown substance. (*See* Report 3–4.) Based on his training and experience, Officer Reese concluded that the substance was crack cocaine. *See Thomas,* 138 Fed.Appx. at 761–62, (Report 3). Officer Reese made this observation and came to this conclusion while patrolling an area known for drug activity. *See Turner,* 1995 WL 63156, at *2–3, 1995 U.S.App. LEXIS 2952, at *6–7, (Report 1–2). Officer Reese knew that Northside Manor employees had recently complained to Reese's supervisor about drug activity in the area, and he was familiar with the area's drug and gang activity from daily patrols and having grown up with friends who lived in the area. (Report. 1–2). Based on these facts, a reasonable police officer would have concluded that Baker had committed or was committed an offense. *Campbell,* 486 F.3d at 955; *Romero,* 452 F.3d at 615. Officer Reese had probable cause to arrest Baker before approaching him, making his warrantless arrest of Baker lawful. *See Thomas,* 138 Fed.Appx. at 761–62; *Marxen,* 410 F.3d at 331.

■■■■ Once a lawful arrest has been made, a police officer may search an arrestee's person and the area within his immediate control. *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034. A police officer need not effect a formal custodial arrest prior to conducting a search incident to arrest. *United States v. Dotson,* 246 Fed.Appx. 897, 903 (6th Cir.2007) (citing *United States v. Montgomery,* 377 F.3d 582, 586 (6th Cir.

2004)); *Williams,* 170 Fed.Appx. at 404. The exception for a search incident to arrest "permits an officer to conduct a full search of an arrestee's person before he is placed under lawful custodial arrest as long as the formal arrest follows quickly on the heels of the challenged search ... and the fruits of that search are not necessary to sustain probable cause to arrest him." *Montgomery,* 377 F.3d at 586 (citing *Rawlings v. Kentucky,* 448 U.S. 98, 100, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)).

■ When he made physical contact with Baker's person, Officer Reese placed one hand in Baker's back pocket to hold the firearm he had previously observed. (*See* Report 6). Under the search-incident-to-arrest exception, Officer Reese had authority to search Baker's person, including the pocket where Baker's gun was located. *See Chimel,* 395 U.S. at 763, 89 S.Ct. 2034.

That Officer Reese did not formally arrest Baker before the search is inconsequential. *See Williams,* 170 Fed.Appx. at 404. Because Officer Reese observed that Baker was committing an offense before approaching him, a "legitimate basis for the arrest existed before the search" of Baker's pocket. *See Williams,* 170 Fed. Appx. at 404. Officer Reese's formal custodial arrest of Baker occurred "quickly on the heels of" Reese's search of Baker's pocket, if not contemporaneously with the search as part of a single transaction. *See id.;* (Report 6). Therefore, Officer Reese's placing his hand on a gun in Baker's back pocket constitutes a search incident to a lawful arrest and comports with the Fourth Amendment.

### 2. Baker's Statement

■ Because Officer Reese did not violate Baker's rights under the Fourth Amendment, the "fruit of the poisonous tree" doctrine, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), does not apply. The Court need not suppress Baker's statements or the firearm found on Baker's person.[6]

## IV. Conclusion

For the foregoing reasons, the Court ADOPTS the Report and Recommendation of the Magistrate Judge as modified and DENIES the Motion to Suppress. All findings and conclusions of the Magistrate Judge not discussed above have not been specifically objected to and are adopted.

So ordered.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

CHARMIANE G. CLAXTON, United States Magistrate Judge.

Before the Court is Defendant James Baker's Motion to Suppress. (D.E. # 35.) The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation. (D.E.# 36.) The Court held a hearing on March 5, 2010, after which the parties submitted post-hearing briefs addressing the issues raised in the instant motion. For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

---

**6.** The record shows that Baker made a statement about the gun in his back pocket when Officer Reese arrested him, but before Baker received the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (*See* Report 6.) Even if Baker had challenged the statement as violative of his Fifth Amendment rights, which he has not, it would remain admissible because Baker volunteered the statement. *See Miranda,* 384 U.S. at 478, 86 S.Ct. 1602 (explaining that "volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected").

## I. Proposed Findings of Fact

On June 14, 2008, Officer Mark Reese ("Officer Reese") of the Memphis Police Department ("MPD") was on duty and was patrolling Northside Manor Apartments ("Northside Manor"). (Tr. at 6–8.) Officer Reese had served as a MPD officer for approximately four-and-a-half years and had previously worked as a Police Service Technician and served in the United States Marine Corps. (Tr. at 6–7, 16.) At Northside Manor, Officer Reese was "working on drug complaints that came in" and "looking for suspicious activity." (Tr. at 6–8, 19.) Officer Reese was not investigating specific complaints on that date, but his lieutenant had advised "a day prior or so" that he was "getting complaints" about Northside Manor and that both management and a maintenance employee were " 'calling, saying it's the wild, wild west over [there].' " (Tr. at 18.) Officer Reese knew it was "an area that had lots of gang activity and lots of drug activity" because he had patrolled there "pretty much every day" during his tenure as a police officer. (Tr. at 7–8.) Officer Reese was also "really familiar" with the area because he "grew up in that area and had lots of friends when [he] attended high school that stayed over there." (Tr. at 8.)

While patrolling, Officer Reese observed an individual, who was later identified as the Defendant, "standing next to a vehicle," conversing with individuals, "going back and forth to an apartment," and engaging in a "hand-to-hand transaction involving money." (Tr. at 9–10.) During the transaction, the Defendant "received the money." (Tr. at 10.) However, Officer Reese did not specifically view any drugs involved in this initial transaction, just a "plastic baggie." (Tr. at 32.) When Officer Reese observed the transaction, it was still "daylight" and he was parked roughly thirty to forty feet away. (Tr. at 10–11, 19.) Officer Reese was in an unmarked car and was not in uniform. (Tr. at 11.)

After this initial transaction, Officer Reese and his partner watched the vehicle that the Defendant had approached "drive off," (Tr. at 11), and the Defendant walked away towards the apartments. (Tr. at 31, 35.) Officer Reese alerted the "marked police unit" that was working with them and that was "hid[den] around the corner" to "make a stop on the vehicle" because "it appeared to be a drug transaction." (Tr. at 11, 31.) Officer Reese stated that he believed that stopping this vehicle was appropriate because it would have evidence of "drugs and pills or whatever." (Tr. at 36.) However, Officer Reese elected not to approach the Defendant after this initial transaction because he believed from his "history of dealing with individuals who sell narcotics" that the Defendant would only have money on his person rather than illegal drugs. (Tr. at 35.) Thus, Officer Reese believed based upon his dealings "in that area" that "normally they don't keep drugs on them" and keep only "whatever they have to sell to whatever individual they're selling to." (Tr. at 35–36.) Thus, because "there's no crime for having money in your pocket," he continued to investigate and observe in attempt to "go after the drugs." (Tr. at 35.) He further testified that, while he believed that he had sufficient evidence to make a stop of the Defendant based upon this initial transaction, he "picked a different battle." (Tr. at 35–36.)

Following this initial transaction, Officer Reese and the Defendant dispute what occurred. Officer Reese testified that he was "leaving the complex" or "attempting to exit" when he saw the Defendant return and begin to approach a second vehicle. (Tr. at 11–12, 31, 36–37, 51–52.) Officer Reese asserts that he was approximately eight feet from the Defendant when he

saw him with a firearm in his back pocket, which he initially thought that the Defendant was "pulling." (Tr. at 12, 32–33, 36–38.) Instead of brandishing the weapon, Officer Reese testified that "that's when he got the crack" from his back pocket, and Officer Reese could "see the crack" and "see the gun." (Tr. at 37–38.)

Officer Reese testified that he was familiar with firearms, as he had served in the Marine Corps Infantry. (Tr. at 53.) Officer Reese stated that the drugs "appeared to be crack" in a "clear plastic baggie." (Tr. at 42.) Officer Reese testified that he formed this opinion based upon his previous arrests involving crack cocaine, his familiarity with the appearance of crack cocaine, and his familiarity with the manner of packaging crack cocaine. (Tr. at 52–53.) Officer Reese stated that he noticed that the Defendant was not "trying to hide" the drugs, or in Officer Reese's terms, "was using no security," as they were "plain" to view. (Tr. at 43.)

Officer Reese testified that, when he realized that the Defendant had a firearm, he told the marked police unit to abandon its efforts to pursue the previous car, despite his belief that it contained evidence of the previous drug transaction, and to "[g]et back here." (Tr. at 13, 37.) Specifically, Officer Reese told the marked police unit, "He's got a gun. He's got a gun. He's got a gun." (Tr. at 13, 33, 39.) Officer Reese stated that the marked police unit had been able to stop the initial vehicle suspected of involvement in the drug transaction but that the officers were only able to briefly ask for the occupants' iden-

tification before Officer Reese alerted them to return to assist with the Defendant. (Tr. at 32.) Thus, the marked unit had to "just let the other vehicle go" and "[n]othing was recovered." (Tr. at 32–33.) Officer Reese says that he chose this course of action because of the "safety issue" that had arisen with the Defendant once he saw the firearm and the Defendant approaching a second vehicle with crack cocaine. (Tr. at 33.) In response to these observations, Officer Reese testified that he "made a U-turn in the parking lot" and proceeded toward the Defendant. (Tr. at 13–14, 29, 40–41.)

The Defendant disputes Officer Reese's version of events, particularly with respect to where Officer Reese was when he says he viewed the firearm and crack cocaine. Specifically, the Defendant states that Officer Reese was at the "beginning of the driveway." (Tr. at 58.) Although the Defendant was not asked to speculate as to the length of this distance, Officer Reese previously testified that the length of the entire driveway was "really long" and "maybe a quarter mile." (Tr. at 19.)[1] On cross-examination, the Government sought to impeach Defendant's credibility based upon his prior felony convictions: felon-in-possession of a handgun in May, 2000; aggravated burglary in May, 2000; theft of property in December, 2005; and aggravated burglary in August, 2007. (Tr. at 61.)

Upon consideration of the conflicting testimony with respect to the second transaction, the Court must determine by

---

1. On two occasions, the Defendant references a distance of one hundred yards. In Defendant's Reply to the United States's Response to Defendant's Motion to Suppress ("Def.'s Reply"), Defendant asserts that the "Memphis Police Department observed the defendant walking south across a parking lot from a distance of over one hundred (100) yards." Def.'s Reply at 1. In Defendant's post-hearing Position on Motion to Suppress ("Def.'s Position"), Defendant asserts that the "front drive way into the Northside Manor apartments is over one hundred (100) yards long." Def.'s Position at 1. However, the Defendant provides no citation to these assertions regarding the distance, and the record before the Court does not reference any such distance of one-hundred yards.

a preponderance of the evidence which version of events to accredit. *See Lego v. Twomey,* 404 U.S. 477, 488–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Colorado v. Connelly,* 479 U.S. 157, 168–169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In this instance, the Court is compelled that Officer Reese's actions on the date in question substantiate his version of events. Specifically, Officer Reese instructed the marked police unit to abort its stop of the initial vehicle, which he believed contained the evidence of an illegal drug transaction involving the Defendant, in order to return to the scene to assist with the "safety issue." (Tr. at 12, 32–33, 37–39.) Because Officer Reese acted in a manner consistent with his observation of a firearm and another potential illegal drug transaction in progress, the Court finds that the evidence preponderates in favor of accrediting Officer Reese's testimony regarding his observation of the Defendant with a firearm and crack cocaine.[2]

After viewing the Defendant approaching this second vehicle, Officer Reese exited his vehicle and approached the Defendant from behind so that he would not see him coming. (Tr. at 13, 44.) Officer Reese stated that he approached the Defendant carefully and inconspicuously because he "didn't want to get into a foot chase with him," "didn't want him to throw the evidence," and "didn't want to get shot." (Tr. at 44–45.) Officer Reese's partner "went to the vehicle that he was making a transaction with" and "went to

the driver's side of that vehicle and made contact with the driver of the vehicle." (Tr. at 13.)

When Officer Reese approached, the Defendant had "one hand on top of the vehicle that was holding a bag of crack cocaine" and was conversing with the occupants of the vehicle. (Tr. at 14.) Officer Reese "approached him from the back," "grabbed his right hand," and used his left hand to hold the gun in the Defendant's back pocket. (Tr. at 14.) The Defendant "didn't resist in any way" but simply said, "[p]olice, police." (Tr. at 14, 45, 47.) Officer Reese subsequently retrieved both the firearm and the drugs, placed the Defendant in handcuffs, and took him into custody. (Tr. at 15, 49.)

During this process, Officer Reese testified that the Defendant immediately stated, "I have a gun in my back pocket." (Tr. at 14.) Officer Reese replied, "I already know" because he had his "hand on the gun." (Tr. at 47.) However, Officer Reese did not include the Defendant's statement regarding having a gun in his pocket in the arrest ticket. (Tr. at 47–48.) Officer Reese stated that he may not have included this information because he "saw the gun in plain view" and "already had [his] hand on the gun" when the Defendant made the statement. (Tr. at 47.) While the Defendant appears to implicitly argue that the Court should not accredit Officer Reese's testimony regarding the Defendant's statement because it was not included in the arrest ticket, the Court does not

---

2. At the hearing on the instant motion, Defendant noted that Officer Reese testified on one occasion that he "left" the complex before the second transaction, but on other occasions that he was "leaving," "attempting to exit," "about to leave," or "attempting to leave." (Tr. at 11–12, 31, 36–37, 51–52.) When asked about this inconsistency, Officer Reese testified that he "never left the complex" and was "sorry" for any confusion with his testimony. (Tr. at 52.) Upon consideration of the record,

the Court remains compelled by Officer Reese's actions that he was sufficiently concerned about the Defendant's possession of a firearm and what he believed to be crack cocaine that he instructed the marked police units to abort the previous stop and return to assist. Thus, the Court finds that this apparent inconsistency does not shift the balance that the evidence preponderates in favor of accrediting Officer Reese's testimony.

find that the absence of this detail is sufficient to preponderate against his testimony given under oath regarding the Defendant's statement.

Finally, with respect to the Defendant's clothing on the date in question, the parties dispute whether the Defendant was wearing clothing that could have prevented Officer Reese from viewing the firearm. Officer Reese testified that he did not "recall what he was exactly wearing" but that he was able to view the firearm. (Tr. at 13, 20, 32–33, 37–39.) However, Defendant testified that he was wearing a shirt that, in length, hung to the middle of his thigh, between his hip and knee. (Tr. at 57.) Defendant stated that his shirt was "untucked" and covered the back pockets of his pants. (Tr. at 57.)

Despite the dispute between Officer Reese's testimony and the Defendant's supposition that it was not possible to see the back pocket of his pants due to his clothing, the Court finds that the evidence preponderates in favor of accrediting Officer Reese's testimony that he observed the firearm on the Defendant's person before approaching, detaining, and arresting him. In particular, the Court is once again compelled by Officer Reese's testimony that his observation of the firearm and what he believed to be an impending second drug transaction—and these observations alone—led him to alert the marked police unit to abandon its stop of the first vehicle despite his belief that it had evidence of the previous illegal drug transaction and to return to the scene to appropriately address the "safety issue." (Tr. at 32–33.)

**3.** Defendant's Motion to Suppress solely requests suppression of the "pistol and drugs." (Def.'s Mot. to Suppress at 1.) However, Defendant's Reply and Defendant's post-hearing Position argue that any statements taken subsequent to any Fourth Amendment violations must be suppressed. (Def.'s Reply at 4;

## II. Proposed Conclusions of Law

The sole issue presented in the instant motion is whether the Defendant's Fourth Amendment rights were violated during his detention and arrest and, if so, whether the evidence of the firearm, crack cocaine, and the Defendant's statement [3] regarding the gun should be suppressed.

■ The Fourth Amendment guarantees the "right of the people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. In cases where no warrant has been obtained prior to the search or seizure, the conduct must "be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under this principle, searches and seizures " 'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.' " *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19–20, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984)).

One such well-delineated exception to the warrant requirement was recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that, " 'where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot,' the officer

Def.'s Position at 5.) Defendant explains that he did not request suppression of the statements in his initial Motion to Suppress because he did not receive the supplemental discovery regarding this statement until after filing his Motion to Suppress. (Def.'s Reply at 2.)

may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Dickerson*, 508 U.S. at 372–373, 113 S.Ct. 2130 (quoting *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). Further, the *Terry* court held that, " '[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.' " *Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130 (quoting *Terry*, 392 U.S. at 24, 88 S.Ct. 1868).

 Otherwise stated, the *Terry* investigative stop allows officers to conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. An investigative stop under *Terry* is limited to "that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry*, 392 U.S. at 26–27, 88 S.Ct. 1868. Evidence obtained from an investigative stop under *Terry* will not be suppressed unless the scope of the protective search went beyond what is necessary to determine if the suspect is armed. *Sibron v. New York*, 392 U.S. 40, 65–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

 A second well-delineated exception to the warrant requirement is that law enforcement officers may seize evidence of a crime that is in "plain view." *See Horton v. California*, 496 U.S. 128, 133–34, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). An "essential predicate" is that "the officer did not violate the Fourth

Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton*, 496 U.S. at 136, 110 S.Ct. 2301. Additionally, the incriminating character of the evidence must be immediately apparent and the officer must be lawfully located in a place from which the object be plainly seen. *Horton*, 496 U.S. at 136–37, 110 S.Ct. 2301 (citations omitted).

 In the instant case, Officer Reese had made several crucial observations before approaching, detaining, and arresting the Defendant. Initially, Officer Reese viewed the Defendant engaging in a hand-to-hand transaction involving a "plastic baggie" where the Defendant received money. (Tr. at 9–10, 32.) Officer Reese was only approximately thirty to forty feet from the Defendant at that time, and it was daylight. (Tr. at 10–11, 19.) Subsequently, Officer Reese observed the Defendant approach a second vehicle, and he saw a firearm in the Defendant's back pocket and a bag of what appeared to be crack cocaine in his hand. (Tr. at 12, 32–34, 37–38, 42–43, 52–53.) At this point, Officer Reese was approximately eight feet away from the Defendant. (Tr. at 12.)

Finally, the Court must consider Officer Reese's observations in context of his information regarding the rate of drug and gang activity at Northside Manor. Officer Reese was aware that "it was an area that had lots of gang activity and lots of drug activity" because he had patrolled there "pretty much every day" during his roughly four-and-a-half years as a police officer. (Tr. at 7–8.) Officer Reese had also grown up in this area and knew it had been an area where drug and gang activity was prevalent. (Tr. at 11.) Most compellingly, Officer Reese had just been advised "a day prior or so" by a lieutenant that he was "getting complaints" about Northside

Manor that it was " 'the wild, wild west over [there].' " (Tr. at 18.)

Upon consideration, the Court finds that Officer Reese's observations of a hand-to-hand transaction where the Defendant received money, the Defendant's possession of a bag believed to possess crack cocaine, and the Defendant's possession of a firearm established, at the very least, reasonable suspicion for Officer Reese to conduct a *Terry* investigative stop based upon his belief that "criminal activity may be afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. Under *Terry*, Officer Reese was permitted to search for and secure any weapons for the safety of the officers and others. *Terry*, 392 U.S. at 24–27, 88 S.Ct. 1868. Thus, Officer Reese's action of grabbing the Defendant's firearm because he "didn't want to get shot" is permissible under the Fourth Amendment as an exception to the warrant requirement.

Once Officer Reese secured the Defendant and his firearm, he again observed the plastic bag that he had previously seen the Defendant carrying and viewed what he believed to be illegal drugs, namely crack cocaine. (Tr. at 12, 32–34, 37–38, 42–43, 52–53.) The Fourth Amendment does not prohibit warrantless seizure of evidence of a crime in plain view, so long as certain conditions are met. *See Horton v. California*, 496 U.S. 128, 133–34, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In the instant case, the Court has already determined that Officer Reese had not violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. *Horton*, 496 U.S. at 136, 110 S.Ct. 2301. On the contrary, Officer Reese viewed the evidence both from a public parking lot and during the course of a permissible *Terry* investigative stop. (Tr. at 12, 32–34, 37–38, 42–43, 52–53.) *See Horton*, 496 U.S. at 136, 110 S.Ct. 2301. Further, the incriminating character of the evidence was immediately appar-

ent to Officer Reese based upon his previous arrests involving crack cocaine, his familiarity with the appearance of crack cocaine, and his familiarity with the manner of packaging crack cocaine. (Tr. at 42–43, 52–53.) Finally, Officer Reese was lawfully located on public premises in a place from which the object could be plainly seen. (Tr. at 12, 32–34, 37–38, 42–43, 52–53.) Thus, the Court concludes that the Fourth Amendment was not violated by Officer Reese's seizure of the illegal drugs that were in plain view.

Finally, the Defendant asserts that his statement declaring to Officer Reese, "I have a gun in my back pocket," should be suppressed if it occurred subsequent to a Fourth Amendment violation. *See United States v. Crowder*, 62 F.3d 782, 786 (6th Cir.1995) (quoting *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)) (holding that a Fourth Amendment violation may taint a subsequent confession). However, the Court has concluded that no Fourth Amendment violation occurred in the instant case. Therefore, the Court finds no basis for suppressing Defendant's statement.

Accordingly, the Court concludes that no constitutional violation occurred in the instant case to warrant the suppression of the evidence of the firearm, the drugs, or the Defendant's statements. Thus, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**IT IS SO ORDERED** this 13th day of September, 2010.