**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0654n.06

No. 09-4398

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Sep 06, 2011***

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| JAMAL ALI, | ) | |
| | ) | OPINION |
| Defendant-Appellant. | ) | |

Before:  WHITE and STRANCH, Circuit Judges, and COHN, District Judge.[*]

**JANE B. STRANCH, Circuit Judge**.  Defendant-Appellant Jamal Ali ("Ali"), a convicted

felon, was found in possession of a loaded .44 caliber magnum revolver.  Ali now challenges the

police encounter that led to the discovery of that weapon.  We **AFFIRM** the district court's decision

to deny Ali's motion to suppress.

## I.  BACKGROUND

### A.     Factual Background

Officer Lester Hill ("Hill"), a patrol officer with the Greater Cleveland Regional Transit

Authority Police Department, was on foot patrol at the Puratis rapid transit station when Taryn

Emrich approached him and told him her cell phone had just been stolen.  Emrich explained that she

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

had been sitting on a newspaper stand outside the station waiting on her bus with her cell phone beside her on another newspaper stand. She had asked Ali's girlfriend, Makila Dozier, for a light for her cigarette and then turned to a second person, who provided her a light. When she turned back around, her cell phone was gone. Emrich told Hill that she did not see who took the phone, but that there were only three people in the vicinity at the time - two black men and a black woman - and so she believed one of them had taken the phone. Emrich pointed out Ali and Dozier, across the platform, as two of the people who had been standing near her when the phone disappeared.

Hill used his phone to dial Emrich's cell and the call rang through, but Hill did not hear the phone ringing anywhere on the platform. He called a second time but the call went straight to voicemail. Emrich then told Hill, "I think he has it," and pointed to Ali. She asked Hill to confront Ali about the phone.

Hill approached Ali, who had gotten in line with Dozier to board a bus. The specifics of Hill's exchange with Ali are disputed. At the suppression hearing, Hill testified that he calmly approached Ali and said: "Hey, this lady is saying you have her phone. Can I check you?" When asked later exactly what he had said to Ali, Hill rephrased: "This lady thinks you have her cell phone. Do you mind checking, and you'll be on your bus. I'll hold the bus, I'll make sure you don't miss the bus." Emrich, who went with Hill to speak to Ali, recalled that Hill said: "Sir, this female thinks you have her phone. Could you please just empty your pockets? You don't have nothing to hide, just empty your pockets."

Dozier testified that Hill approached her and Ali and said, "Excuse me, may I talk to you all." Hill told them Emrich said her phone was missing and then asked if she and Ali had it. They both

2

said no, and then Hill said they were two of the three people standing near Emrich and the phone at the time it went missing. Dozier testified that "[Hill] said take everything out of our pockets," which Dozier proceeded to do. Hill and Ali then had a back-and-forth verbal exchange.[1] Hill testified that Ali became agitated, started walking towards him, and said, "I ain't got her phone." Dozier testified that Ali began asking Hill why he focused in on Ali instead of questioning the third person who was standing by the newspaper stands with them. It is undisputed that Ali then began pulling items out of his jacket pockets and showing them to Hill.

Hill testified that as Ali pulled items out of his jacket pockets, the jacket rode up and the butt of a revolver became visible under Ali's jacket.[2] Hill said "I reached down, grabbed onto the gun. I pulled out my Glock service revolver and put it up to [Ali's] head." The two struggled over the weapon and as Ali stumbled backwards, Hill was able to dislodge the gun from Ali's possession. Ali then ran from the station and was later discovered by police and arrested.

## B. Procedural Background

Ali was indicted on charges of unlawful possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He challenged his encounter with Hill as an unlawful search and seizure and moved the district court to suppress the evidence that was a product of that encounter. After an evidentiary hearing, the district court denied the motion to suppress finding that the evidence was

---

[1] Hill testified that this verbal exchange took no more than 25 to 30 seconds. (R. 38 at 56). Dozier testified that the verbal exchange lasted for approximately ten minutes. (R. 38 at 78-79).

[2] Hill testified that the gun was in Ali's waistband, but Ali told investigators that it was in his pants pocket.

obtained during a consensual encounter between Defendant Ali and Officer Hill. In the alternative, the court found that, even characterizing the encounter as a *Terry* stop, Hill reasonably suspected that the Defendant had committed a crime.

After the court's decision denying the motion to suppress, Ali entered a guilty plea pursuant to a Rule 11 agreement conditioned on his ability to appeal the suppression issue. The court sentenced Ali to 60 months' incarceration followed by 3 years of supervised release. Ali now appeals the district court's denial of his motion to suppress.

## II. ANALYSIS

Ali argues that Hill "stopped, seized and searched" him without a warrant, probable cause, or a reasonable suspicion of criminal activity. However, we agree with the district court that the encounter, before Hill saw Ali's weapon, was consensual.[3] Additionally, we find no error in Hill's subsequent seizure and frisk of Ali to secure his weapon.

### A. Standard of Review

"In an appeal of the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005). Issues of consent, seizure, and reasonable suspicion are questions of law, but "this Court must give considerable deference to the district court's credibility determinations." *Id*.

### B. Consent

---

[3]Because we find the initial encounter to be consensual, we do not address the alternative holding of the district court that the initial encounter was supported by reasonable suspicion sufficient to have validated a *Terry* stop of Ali.

The Fourth Amendment requires that all "searches and seizures be founded upon an objective justification," *United States v. Mendenhall*, 446 U.S. 544, 551 (1980), including brief, investigatory detentions known as *Terry* stops. *Terry v. Ohio*, 392 U.S. 1 (1968).

The first relevant question here is whether a seizure occurred. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Mendenhall*, 446 U.S. at 552 (quoting *Terry*, 392 U.S. at 19 n. 16). This test is met when the citizen's "freedom of movement is restrained." *Id.* at 553. However, an encounter is consensual, and therefore falls short of a seizure, "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quotation marks and citation omitted). "[N]o seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage -- so long as the officers do not convey a message that compliance with their requests is required." *Id.* at 437. An analysis of consent requires "taking into account all of the circumstances surrounding the encounter." *Id.*; *see United States v. Drayton*, 536 U.S. 194, 207 (2002) ("the totality of the circumstances must control").

Ali argues that the encounter, even before Ali and Hill began to physically struggle, was not a consensual encounter between a police officer and a citizen. We disagree. In *Bostick*, two police officers boarded a bus and asked to inspect the defendant's ticket and identification. 501 U.S. at 431. The officers then asked if they could search the defendant's luggage, but informed him that he could refuse. *Id.* at 432. The defendant consented and the officers discovered cocaine in one of the bags. *Id.* The Supreme Court held that this was not an unconstitutional seizure, stating: "There is no

doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure." *Id*. at 434. The court reached the same conclusion in *Drayton*, under circumstances similar to, but arguably more coercive than, *Bostick*.[4] Comparing this case to *Bostick* and *Drayton*, it is clear that no unlawful seizure occurred under the circumstances. The defendants in *Bostick* and *Drayton* were sitting in bus seats from which they could not easily extricate themselves, and they were responding to inquiries from one of several police officers, who was standing in the aisle and looking down at them. By contrast, Ali and Hill's encounter took place on the bus platform, with both men standing and facing each other, and Hill was the only officer present. And regardless of whether Hill asked Ali to turn out his pockets or asked if he could conduct a search of his person, "[n]othing he said would suggest to a reasonable

---

[4]In *Drayton*, three police officers boarded a bus: one knelt on the driver's seat and faced the rear of the bus, another went to the back of the bus and faced forward, and the last officer worked his way toward the front of the bus, speaking to each passenger individually. 536 U.S. at 197-98. The officer did not tell passengers that they could refuse to cooperate. *Id*. at 198; *see also id*. at 211 (Souter, J., dissenting). The officer walked down the aisle to where the defendant ("Drayton") sat with his companion ("Brown") and obtained their consent to search their luggage. *Id*. at 199. The officer then asked Brown if he could check his person. Brown agreed and cooperated by leaning up in his seat and opening up his jacket. The officer found drugs concealed between layers of clothing and arrested Brown, who was led off the bus by another officer. *Id*. The officer then asked to search Drayton, who accepted and, still sitting, lifted his hands from his legs. The officer found drugs on Drayton and arrested him as well. *Id*. The Supreme Court upheld the seizure, stating:

> The officers gave the passengers no reason to believe that they were required to answer the officers' questions . . .
> . . . There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice. *It is beyond question that had this encounter occurred on the street, it would be constitutional.*

*Id*. at 203-04 (emphasis added).

person that he or she was barred from leaving the bus stop or otherwise terminating the encounter."

*Drayton*, 536 U.S. at 204.

Ali bases his argument on two alleged facts. First, he states that Officer Hill stepped in front of Mr. Ali and stood between Mr. Ali and the bus, an action that would cause any reasonable person to conclude that he was not free to walk away. As a preliminary matter, this allegation is based wholly on Emrich's testimony, which the district court found not to be credible.[5] Ali also asserted that Hill's testimony suffered from various inconsistencies. Given the district court's ability to physically assess credibility during testimony, we do not find the court's credibility determination to be clearly erroneous. Even assuming Hill stood between Ali and the bus, this does not rise to the level of a physical restraint on Ali's freedom of movement. Dozier testified that she had already boarded the bus when Hill approached them and that she stepped off the bus to answer his questions, indicating the pair had some freedom of movement.

Second, Ali argues that Hill's promise to hold the bus for him while the search was taking place indicates that Ali was not free to leave as there would have been no reason to hold the bus if Ali had been truly free to disregard Officer Hill and get on the bus. However, we do not find this to be a necessary, or even very strong inference. Hill's statement can support a finding of consent. The offer made it possible for Ali to agree to Hill's request without missing his bus. The promise indicates Hill was attempting to persuade Ali to stay and answer his questions by removing a potential excuse for refusing.

---

[5]Various aspects of Emrich's testimony were contradicted by video footage from surveillance cameras outside the bus station.

As to Ali's emptying his pockets, there is nothing on the record to indicate that Ali's action was forced. Ali argues Hill commanded him, pointing to the testimony of Dozier and Emrich, both of whom said Hill asked Ali to empty his pockets. However, such a request was proper under *Bostick*, and Ali has pointed to nothing in the record to indicate Hill's request was a command. The district court found persuasive Hill's testimony that he would never ask or order a citizen to empty his or her pockets because that tactic is dangerous and could lead to unwanted results such as a weapon being pulled. Additionally, we are persuaded by Ali's interview with ATF Agent Nathan Honaker, recorded after he was taken into custody. Ali admits he began removing items from his jacket pockets to satisfy Hill that he did not have Emrich's phone and to keep Hill from discovering the weapon in his pants pocket.

In light of all of the circumstances surrounding the encounter up to the point where Hill saw Ali's gun, we concur with the district court's determination that the occurrence was a consensual encounter between a police officer and a citizen and not a seizure.

## C.    Weapon Search

The district court was correct that the nature of the encounter between Hill and Ali changed at the moment Hill saw Ali's revolver. Hill testified that he grabbed the gun with his left hand, put his own service revolver to Ali's head with his right hand, pushed him against a concrete pillar, and tried to leg-sweep him to take him down. There is no doubt that this physical confrontation constituted a seizure.

Consensual encounters sometimes turn into seizures based on the information uncovered or believed to be withheld. *See, e.g.*, *Florida v. Royer*, 460 U.S. 491, 502-03 (1983) (plurality opinion)

(describing a consensual encounter in an airport terminal between police officers and an individual suspected of drug trafficking, which escalated into a seizure when the officers took the man to an interrogation room to confirm their suspicions). "Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007). *Terry* allows a very limited frisk of a citizen seized for brief investigation, but only when the officer "harbor[s] reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 129 S.Ct. 781, 784 (2009). Even "despite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, . . . *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990).

It is apparent that Hill's frisk of Ali upon seeing Ali's weapon was supported by individualized suspicion that Ali was armed and dangerous. Tellingly, Ali does not argue Hill lacked reasonable suspicion that Ali was armed and dangerous. Indeed, such an argument would be disingenuous given Hill's visual verification that Ali was armed and the fact that the frisk immediately became a struggle over the weapon. Instead, Ali argues that the district court erred in accepting Hill's version of the facts and proposes instead that Hill first seized Ali, then pulled up his shirt and saw the gun.

We will give due deference to the district court's credibility determinations. On this he-said, he-said record, we do not find the district court's construction of the facts to be clearly erroneous.

9

Therefore, we find Hill's physical seizure of Ali to be supported by a reasonable suspicion that Ali was armed and dangerous.

### III.  CONCLUSION

For the forgoing reasons, we **AFFIRM** the district court's denial of Ali's motion to suppress the evidence resulting from his encounter with Hill.