NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0134n.06

Case No. 25-5435

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| GREGORY KILGORE, III, | ) ) | |
| Defendant - Appellant. | ) ) | OPINION |

FILED
Mar 12, 2026
KELLY L. STEPHENS, Clerk

Before: McKEAGUE, LARSEN, and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** Gregory Kilgore III twice admitted to possessing illegal drugs after officers detained him inside of his apartment building. Officers then got a search warrant for Kilgore's unit and found illegal narcotics inside. The government charged Kilgore with drug and gun crimes. The district court denied in part Kilgore's motion to suppress his incriminating statements and denied his motion to suppress evidence stemming from his arrest. Kilgore pled guilty and now appeals the denial of his suppression motions. We affirm.

**BACKGROUND**

**I.        Pre-arrest investigation**

On November 6, 2023, Kentucky State Police Detective Dillon Spencer monitored a controlled narcotics transaction in the parking lot of a Louisville apartment complex. The purchase was delayed because the target of the investigation was waiting for his "brother" to bring him the drugs. RE 36, Second Supp. Hr'g Tr., PageID 155-58. As he waited, Spencer saw multiple people enter and exit the apartment building, including a man, later identified as Kilgore, who left with a

"department store type bag" and returned roughly an hour later carrying the same bag. *Id.* at PageID 156. "[W]ithin a matter of minutes" of Kilgore returning to the building, the target completed the drug purchase in the parking lot. *Id.* at PageID 181. Spencer did not see Kilgore contact the target or go to the parking lot, but "based on the time line [sic], it was apparent" to Spencer that Kilgore "was connected to the controlled purchase." *Id.* at PageID 166-67, 184.

Two weeks later, Spencer and other officers returned to the apartment complex to execute a search warrant for the target's ninth-floor unit. Before they did, they spoke to apartment staff to notify them of the search warrant and gain access to the building. The apartment staff informed the officers that the target had a friend, whom the staff referred to as the target's "brother," living in Unit 402 of the building. *Id.* at PageID 160, 191. The staff also showed the officers a picture of the brother, later identified as Kilgore, and escorted Spencer to the exterior of Unit 402 to "get a visual." *Id.* at PageID 160-61.

As Spencer and the others prepared to execute the search warrant on the target's unit, other officers separately detained the target at a probation appointment. The officers explained to the target—who faced significant time in prison—that if he cooperated, they "would try to assist him" by engaging him as an informant. *Id.* at PageID 196-97. The target agreed to cooperate with the officers and identified "Kilgore in Unit 402" as his drug supplier. *Id.* at PageID 188.

Meanwhile, Spencer and the other officers executed the search warrant on the target's ninth-floor apartment and found drugs inside. Four of these officers then went to Kilgore's apartment on the fourth floor. As they did, Spencer, who was on the ground level with another officer, informed them that Kilgore was in the elevator heading up to his apartment. At some point before Kilgore arrived on the fourth floor, the officers learned that he had previously been charged

with second degree robbery and had attempted to "elude" law enforcement years earlier. *Id.* at PageID 162, 164.

As Kilgore arrived at the fourth floor, the armed officers immediately handcuffed him. One officer held a rifle and "[a]t some point in the interaction," at least one officer pointed a gun at Kilgore. RE 23, First Supp. Hr'g Tr., PageID 80, 98. Kilgore asked the officers what was "going on," and they informed him that they were conducting a drug investigation and suspected that he had drugs in his apartment. *Id.* at PageID 69. Kilgore responded by asking the officers if they "want[ed] to go see [the drugs]." *Id.* During this interaction, Kilgore either dropped, or was instructed to set down, his keys and cell phone, which the officers kept.

Shortly after, Spencer and another officer joined the group on the fourth floor. Spencer read Kilgore his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), which Kilgore acknowledged that he understood. The officers repeated that they were conducting a narcotics investigation and asked if he would speak with them. Kilgore again asked what was going on, and the officers told Kilgore that they suspected that he had drugs inside of his apartment. Kilgore acknowledged that he had drugs inside of his apartment and offered to show them to the officers, saying "[y]ou all can see, I mean, you got me now, shit." RE 44, Supp. Mot. Order, PageID 256; CA6 R. 34, Reply Br., at 4.

The officers obtained a warrant to search Kilgore's apartment. The warrant affidavit said that officers learned during their 130-day narcotics investigation that Kilgore was "associated" with the target and that Kilgore made incriminating statements outside of his apartment suggesting that he possessed illegal drugs. RE 36, Second Supp. Hr'g Tr., PageID 203-09, 218-21.

As the officers waited for the warrant, they detained Kilgore for several hours in the hallway. The officers described Kilgore's demeanor as "very calm and polite." RE 23, First Supp.

Hr'g Tr., PageID 99. At some point during this detention, Kilgore asked for an attorney and said that he believed that he was going to jail. The officers executed the warrant later that day and found drugs, four guns, and a grenade in Kilgore's apartment.

## II. Procedural history

The government charged Kilgore with three counts of possession with intent to distribute controlled substances, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a convicted felon. Kilgore moved to suppress the statements he made to law enforcement in the hallway of his apartment building. The district court held a hearing, where Kilgore also attempted to challenge the circumstances of his arrest and subsequent search warrant. The court declined to hear these arguments at the time but permitted Kilgore to file another suppression motion.

Kilgore filed another motion seeking to suppress "all evidence obtained by law enforcement during an unlawful arrest in the hallway of his apartment building" because "there was no probable cause." RE 22, Second Mot. to Supp., PageID 437. The district court held another hearing, where Kilgore challenged the basis for his detention in the hallway and the search warrant for his apartment.

After the second hearing, the district court ordered additional briefing from the parties. In his post-hearing brief, Kilgore argued for the first time that the hallway detention was unlawful because the warrant that granted them access to the building only permitted the officers to search the ninth-floor hallway and the target's apartment. Therefore, Kilgore argued, the officers were not lawfully present in the fourth-floor hallway.

The district court granted in part and denied in part Kilgore's motion to suppress his statements and denied his motion to suppress evidence obtained as a result of his hallway detention.

The district court concluded that Kilgore was taken into custody "the moment the elevator doors opened" and accordingly suppressed the incriminating statement he gave prior to being advised of his *Miranda* rights. RE 44, Supp. Order, PageID 260-61. The court, however, found that Kilgore voluntarily waived his rights, so it declined to suppress Kilgore's subsequent incriminating statement.

As to Kilgore's second motion, the district court found that the initial detention as Kilgore got out of the elevator was legal under *Terry v. Ohio*, 392 U.S. 1 (1968), because the officers reasonably suspected Kilgore had committed or was about to commit a crime. The court also found that, after Kilgore waived his *Miranda* rights and admitted to possessing drugs, the officers had probable cause to arrest Kilgore and search his apartment. The district court did not address Kilgore's argument that the officers were unlawfully present in the fourth-floor hallway.

Kilgore entered a conditional guilty plea to all charges. After being sentenced to 180 months in prison, Kilgore timely appealed the district court's suppression ruling.

## ANALYSIS

In reviewing the denial of a motion to suppress, we review the district court's legal findings de novo and factual findings for clear error. *United States v. Campbell*, 486 F.3d 949, 953 (6th Cir. 2007). The district court does not clearly err "where there are two permissible views of the evidence." *Id.* We "review the evidence in the light most likely to support the district court's decision." *Id.* (citation omitted).

## I. *Terry* stop

Kilgore first argues the officers conducted a *Terry* stop without reasonable suspicion. We disagree.

The Constitution prohibits "not all searches and seizures, but unreasonable searches and seizures." *Terry*, 392 U.S. at 9 (citation omitted). Officers are permitted to "briefly detain a person for investigative purposes so long as it is 'reasonable.'" *United States v. Young*, 707 F.3d 598, 603 (6th Cir. 2012) (citing *Terry*, 392 U.S. at 20-22). We evaluate a *Terry* stop's constitutionality by first asking whether there was a proper basis for the stop based on the officers' awareness "of specific and articulable facts which gave rise to reasonable suspicion" that "criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (citation omitted). In conducting this inquiry, we consider the "circumstances as a unified whole rather than as a series of disconnected facts." *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012). "[I]f we conclude that the basis for the *Terry* stop was proper, then we must determine whether the degree of intrusion was reasonably related in scope to the situation at hand," determined by "the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Davis*, 430 F.3d at 354 (citation modified).

Here, the officers reasonably suspected Kilgore of criminal activity based on the target's identification of Kilgore as his supplier, the target's statement that he was waiting on his "brother" to complete the drug transaction, the apartment staff's later identification of Kilgore as the target's "brother," and Spencer's observation of Kilgore entering and leaving the apartment around the time the target completed a drug transaction. RE 36, Second Supp. Hr'g Tr., PageID 150, 156, 158, 160-61. Taking these circumstances together, the officers were aware of "specific and articulable facts" that led them to believe "criminal activity ha[d] occurred or [was] about to occur" when they encountered Kilgore in the hallway. *Davis*, 430 F.3d at 354 (citation omitted).

Kilgore instead urges us to examine the facts individually. For instance, he argues that the police cannot rely on the target's mention of a "brother" and the apartment staff's identification of

Kilgore as the target's "brother" because the target only meant that Kilgore was his friend.  CA6 R. 26, Appellant Br., at 8.  But it was not just that the staff identified Kilgore as the target's brother.  The officers also knew that the target could not complete the drug transaction until his "brother" arrived, Kilgore arrived at the apartment complex with a bag shortly before the target sold the drugs, and the target later identified Kilgore as his supplier.  RE 36, Second Supp. Hr'g Tr., PageID 150-60, 188.  These facts known to the officers, taken together, comprised more than a "hunch" that Kilgore possessed illegal drugs.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation omitted).

Kilgore also challenges the stop's level of intrusion.  It is true that the armed officers handcuffed Kilgore almost immediately after he got out of the elevator.  "[D]isplays of force" do not "automatically transform a *Terry* stop into an arrest," but they "must be warranted by the circumstances."  *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015) (citation omitted).  Such measures are warranted "where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers."  *Id.*

Here, the officers were aware that Kilgore had previously been charged with a violent felony and fled from law enforcement.  Spencer also testified that it is common for drug traffickers to carry firearms.  Under these circumstances, the officers were permitted to place Kilgore in handcuffs as they investigated further.  *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) ("[T]he agents were, therefore, entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions and, thus, the degree of force utilized was reasonable.").  Shortly after placing Kilgore in handcuffs, Kilgore admitted to possessing drugs, verifying the officers' suspicions and providing probable cause to arrest him.

The scope of the *Terry* stop was reasonable, so we affirm the district court on this issue.

## II.     Lawfulness of police presence on the fourth floor

Kilgore also argues the district court erred by failing to rule on the lawfulness of the officers' presence on the fourth floor of his building.  We disagree.

Kilgore filed two motions to suppress: the first sought to suppress Kilgore's incriminating statements, and the second sought to suppress evidence obtained during his allegedly unlawful arrest because "there was no probable cause."  RE 22, Second Mot. to Supp., PageID 437.  After the district court held two hearings, Kilgore argued for the first time in a post-hearing brief that the officers were not lawfully on the fourth floor of the apartment complex because the first search warrant permitted them to enter only the ninth floor and the target's apartment.  Kilgore concedes on appeal that his second motion to suppress did not encompass his argument that the officers were not legally present in the hallway.

Kilgore nonetheless argues "[f]or unknown reasons, the district court did not rule on the issue."  CA6 R. 34, Reply Br., at 10.  But the district court reasonably declined to rule on the issue because Kilgore neither relied on it in his motions nor raised it in either suppression hearing.  *See United States v. Miller*, 588 F. App'x 445, 447-48 (6th Cir. 2014) (affirming district court when it declined to consider suppression argument raised for the first time in post-hearing briefing).  As we read the transcript, the post-hearing briefing was not intended as an opportunity to raise novel issues but instead to make arguments concerning the second suppression hearing.  More to the point, Kilgore's new argument for suppression came well after the court's deadline, and Kilgore never sought to file another motion.  *See* Fed. R. Crim. P. 12(c)(3).  Therefore, the court did not err.

### III.     **Voluntariness of Kilgore's post-*Miranda* confession**

Finally, Kilgore argues that the statements he made after receiving *Miranda* warnings were involuntary.  We disagree.

A defendant's statement made during a custodial interrogation is inadmissible "unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [his] *Miranda* rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation modified) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).  "Waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.* at 382-83 (citation modified).  Although the government "bears the burden of establishing a waiver by a preponderance of the evidence," *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012), because the district court denied Kilgore's motion to suppress his post-*Miranda* statement, we "consider the evidence in the light most favorable to the government," *United States v. Pearce*, 531 F.3d 374, 379 (6th Cir. 2008) (citation omitted).

The district court suppressed Kilgore's pre-*Miranda* inculpatory statement but found that Kilgore voluntarily waived his rights after Spencer read him his *Miranda* warnings.  During his interaction with the officers, Kilgore was handcuffed, surrounded by armed officers, and his keys and phone were held by the police.  But Kilgore cites no authority showing that these facts voided his waiver of *Miranda* rights.  Indeed, during the interaction with police, Kilgore maintained a "very calm and polite" demeanor and verbally indicated that he understood his rights.  RE 23, First Supp. Hr'g Tr., PageID 97, 99.

Moreover, Kilgore has made no "claim that police threatened or injured him . . . or that he was in any way fearful." *Berghuis*, 560 U.S. at 386. Nor does he argue that the officers intended to thwart the purpose of reading his *Miranda* rights by eliciting a pre-*Miranda* confession before giving him his rights and having him confess again. *Cf. Missouri v. Seibert*, 542 U.S. 600, 613-14 (2004). He merely argues that "[t]he extreme show of force, in an unexpected environment – inside the locked confines of his residence – contributed to [his] stunned resignation to the will of the authorities, before and after he was read the words meant to signify his rights." CA6 R. 34, Reply Br., at 8 (quoting CA6 R. 26, Appellant Br., at 15). But the presence of armed officers and setting of his apartment hallway alone are insufficient to invalidate his waiver or confession.

"As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385. Here, Kilgore behaved in such a manner. So, we agree with the district court.

## CONCLUSION

For the reasons above, we affirm.